# EXHIBIT A



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**December 21, 2018 08:58**

By: BRIAN A. MURRAY 0079741

Confirmation Nbr. 1581739

JOHN DOE                                        CV 18 908696

    vs.

CASE WESTERN RESERVE UNIVERSITY, ET AL.        **Judge:**  MICHAEL E. JACKSON

**Pages Filed:**  85

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOHN DOE, | ) | Case No.: |
| c/o Zukerman, Daiker & Lear, Co., L.P.A. | ) | |
| 3912 Prospect Ave. East, | ) | |
| Cleveland, Ohio 44115 | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| vs. | ) | |
| | ) | **VERIFIED COMPLAINT** |
| CASE WESTERN RESERVE | ) | **(JURY TRIAL DEMANDED)** |
| UNIVERSITY, | ) | |
| 10900 Euclid Avenue, | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| CASE WESTERN RESERVE | ) | |
| UNIVERSITY BOARD OF TRUSTEES, | ) | |
| 10900 Euclid Avenue, | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| DARNELL PARKER, | ) | |
| Associate Vice President for Student Affairs | ) | |
| and University Title IX Coordinator | ) | |
| Case Western Reserve University | ) | |
| 10900 Euclid Avenue | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| CWRU DOE DEFENDANTS 1-10 | ) | |
| Designated Reporting Representatives and | ) | |
| Investigators | ) | |
| Case Western Reserve University | ) | |
| 10900 Euclid Avenue | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
| Defendants. | ) | |

3912 PROSPECT AVE.   216.696.0200   ZUKERMAN DAIKER & LEAR CO.LPA
CLEVELAND, OHIO 44115   218.696.8800

Plaintiff, John Doe[1] (hereinafter "Plaintiff"), by and through undersigned counsel, and for his Verified Complaint[2] against Defendants Case Western Reserve University (hereinafter "CWRU"), Case Western Reserve University Board of Trustees (hereinafter "CWRU Board of Trustees"), Darnell Parker (hereinafter "Title IX Coordinator Parker"), and CWRU Doe Defendants 1-10 (hereinafter "CWRU Doe Defendants") respectfully alleges as follows:

## INTRODUCTION

1. "In recent years, universities across the United States have adopted procedural and substantive policies intended to make it easier for [alleged] victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F.Supp. 3d 561, *572 (Mass. D.C. 2016). "That process has been substantially spurred by the Office for Civil Rights of the Department of Education, which issued a "Dear Colleague" letter in 2011 demanding that universities do so or face a loss of federal funding." *Id.*

2. "If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision." *Id.* "Put simply, a fair determination of the facts

---

[1] Plaintiff herewith files a motion for him to proceed pseudonymously.
[2] Plaintiff has attached an Affidavit to his Verified Complaint. As Plaintiff seeks to proceed pseudonymously, he has redacted his name from the copy of his Affidavit that is attached to his Verified Complaint. Plaintiff respectfully asserts that intends to seek leave to file his original Affidavit that bears his name under seal with this Honorable Court and that upon this Honorable Court granting him leave to file said Affidavit under seal, he will timely do so.

requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder not predisposed to reach a particular conclusion." *Id.*

3. "School disciplinary hearings must be 'conducted with basic fairness.'" *Id.* at *601. "A [private university's] obligation to provide basic fairness in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in the [University's Student] Handbook." *Id.*

4. "It is well-established that the student-college relationship is contractual in nature." *Id.* at *503. "The terms of the contract may include statements provided in student manuals and registration materials." *Id.*

## THE NATURE OF THIS ACTION

5. This case arises out of the actions taken and procedures employed by Defendants CWRU, CWRU Board of Trustees, CWRU Title IX Coordinator Parker, and the CWRU Doe Defendants, (hereinafter collectively referred to as the "CWRU Defendants") in response to allegations of non-consensual sexual intercourse and non-consensual touching made against Plaintiff by a fellow CWRU student who, for purposes of this Complaint, Plaintiff will identify as Jane Roe.

## CWRU'S SEXUAL MISCONDUCT POLICY

6. Pursuant to CWRU's Sexual Misconduct Policy (hereinafter "the Policy"),[3] when a complaint of alleged sexual misconduct is received, an initial inquiry is conducted by a Designated Reporting Representative, who is supposed to be a neutral administrator in the process.[4]

---

[3] CWRU Sexual Misconduct Policy, attached hereto as Exhibit 1.
[4] *Id.* at p.16.

7.   Appendix A to the Policy identifies eleven (11) CWRU employees who are considered a Designated Reporting Representative and/or Title IX Investigator.[5]

8.   While the Policy authorizes the university to retain an investigator from outside the university community to serve as Title IX investigator in an investigation, the Policy does not authorize the university to retain someone from outside the university to serve as a Designated Reporting Representative and/or Deputy Title IX Coordinator during an investigation.[6]

9.   Pursuant to the Policy, the initial inquiry is to be conducted by the Designated Reporting Representative and/or the Title IX Coordinator and will generally include interviews with the complainant and the respondent and a review of relevant documents.[7]

10. While the Policy provides that a Title IX investigator can interview witnesses, it does authorize the Title IX investigator to interview the complainant or the respondent.

11. Pursuant to the clear language contained in the Policy, there can be a significant difference between someone who is considered a Title IX investigator compared to someone who is considered a Designated Reporting Representative and/or Title IX Coordinator, because a Title IX investigator can be retained by the university from outside the university community, whereas the Designated Reporting Representative and/or Title IX Coordinator are members of the university community.

---

[5] *Id.* at p. 28.
[6] *Id.* at p. 30.
[7] *Id.*

12. Following the initial inquiry, the Title IX Coordinator is supposed to determine whether the information gathered during the initial inquiry indicates that the complaint falls within the Policy.[8] If it is determined that the complaint falls within the Policy, the Title IX Coordinator and/or Designated Reporting Representative will either: 1) proceed with the Informal Process; or 2) refer the matter to the Sexual Misconduct Investigator/Title IX Coordinator for a determination as to whether the process should proceed to the Informal Process, the Formal Process, or another university process.[9]

13. The Policy advises that the Designated Reporting Representative/Title IX Coordinator and/or Title IX Investigator is to conduct a prompt and thorough investigation of the complaint, which includes identifying and interviewing witnesses, gathering and securing relevant documentation, and identifying other relevant information.[10]

14. The Policy provides that depending on the number of ongoing investigations and/or the nature and complexity of the complaint, the Title IX Investigator for a complaint may be a qualified investigator retained by the university from outside the university community.[11]

15. The Designated Reporting Representative/Investigator provides a report of the finding of the investigation for review by the Title IX Coordinator or his/her designee in consultation with the Office of General Counsel.[12]

---

[8] *Id.*
[9] *Id.*
[10] *Id.* at p. 17.
[11] *Id.* at p. 17 and p. 29.
[12] *Id.* at p. 17.

16. In addition to conducting an initial inquiry, the Designated Reporting Representative/Title IX Coordinator is permitted to take interim actions to protect the safety and well-being of individuals involved in a complaint of sexual misconduct.[13]

17. The Policy provides that during the Board Hearing, the Sexual Misconduct Panel will consider the report of the Title IX Investigator.[14]

18. The Investigator/Title IX Coordinator who investigated the matter is required to be present at the Sexual Misconduct Hearing to answer questions from the panel.[15]

19. During the Board Hearing, the complainant and the respondent are permitted to ask questions of each other, but only by submitting written questions to to the chair.[16]

20. While the respondent and complainant are permitted to have an advisor at the hearing, the advisor is only permitted to talk quietly with their advisee or pass notes to their advisee in a non-disruptive manner.  The advisor may not, in any way, intervene in the hearing or address the panel.[17]

21. The Policy does not provide whether the chairperson must ask the questions that the respondent and/or complaint submit and request to be asked of each other.[18]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at p. 21.
[18] *Id.*

22. Accordingly, the CWRU Defendants refuse to provide Plaintiff with any form of meaningful cross-examination, which is clearly unconstitutional.

23. The CWRU Defendants provide complete due process protections, including the right to cross-examination, for students facing all forms of discipline *other* than involving sexual misconduct.  The CWRU Defendants have no explanation for this separate and unequal policy.

## THE PARTIES

24. Plaintiff and Jane Roe were both first year undergraduate students at Case Western Reserve University who resided in university housing in Cleveland, Ohio at all times relevant herein.

25. Plaintiff was/is a citizen of the State of Ohio at all times relevant herein.

26. On information and belief, Jane Roe was/is a citizen of Maryland at all times relevant herein.

27. Defendant CWRU is a not-for-profit Ohio corporation and private university located in Cleveland, Ohio.

28. Upon information and belief, the CWRU Board of Trustees is the governing body of CWRU.  Upon information and belief, the Board of Trustees is responsible for setting policy to govern the university and approving budgets and expenditures.

29. Upon information and belief, Title IX Coordinator Parker is a citizen of the State of Ohio.

30. Upon information and belief CWRU Doe Defendants are citizens of Ohio and are employees of CWRU who, in addition with Title IX Coordinator Parker, comprise the Designated Reporting Representatives and/or Investigators from the Office of Title IX at CWRU.

31. Title IX Coordinator Parker and the CWRU Doe Defendants are sued both in their personal and official capacities.

## JURISDICTION AND VENUE

32. This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because:  (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

33. This Court has personal jurisdiction over CWRU on the ground that it is located in and conducts business within Cuyahoga County, Ohio.

34. This Court has personal jurisdiction over the CWRU Board of Trustees on the grounds that the Board of Trustees in located in and conducts business within the Cuyahoga County, Ohio and is the governing body of CWRU.

35. This Court has personal jurisdiction over Title IX Coordinator Parker on the ground that he was acting as an agent of CWRU at all relevant times herein.

36. This Court has personal jurisdiction over the CWRU Doe Defendants on the ground that said defendants were acting as agents of CWRU at all relevant times herein.

37. Venue for this action is properly lies in Cuyahoga County because CWRU is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

38. On a date prior to December 3, 2018, Jane Roe falsely accused Plaintiff of performing oral sex on her without her consent and engaging in sexual intercourse with her without her consent on the morning of October 21, 2018 in her residence hall room (hereinafter "the alleged Incident") on the campus of CWRU.

39. At the time of the alleged Incident, Plaintiff was seventeen (17) years old.

40. On information and belief, at the time of the alleged Incident, Jane Roe was eighteen (18) years old.

41. The events leading up to the alleged Incident involving Jane Roe asking the Plaintiff to walk with her from her on campus residence hall to a residence that was located off campus so that she could purchase marijuana.

42. Jane Roe asked Plaintiff to walk with her because she did not feel safe walking off campus, alone at night.

43. Plaintiff agreed to walk with Jane Roe to the off-campus residence and watched and she purchased marijuana from a person at the off-campus residence.

44. Plaintiff and Jane Roe then walked back to Jane Roe's residence hall on campus.

45. Jane Roe invited Plaintiff and a mutual acquaintance of theirs to follow her to her residence hall room to smoke the marijuana that she had just purchased.

46. Jane Roe, Plaintiff, and their mutual acquaintance socialized in Jane Doe's residence hall room as Jane Roe packed the marijuana and prepared a bowl for the three (3) of them to smoke.

47. Jane Roe, Plaintiff, and their mutual acquaintance all smoked the bowl of marijuana that Jane Roe prepared.

48. The mutual acquaintance eventually left Jane Roe's residence hall room.

49. Jane Roe and Plaintiff remained in Jane Roe's residence hall room and began kissing one another.

50. The night/morning of the alleged Incident was the second time that Jane Roe and Plaintiff had kissed each other.

51. On an evening close in time to the alleged Incident, Plaintiff and Jane Roe were kissing each other and were fondling each other through the outside of their clothing in a study room in a residence hall located on CWRU's campus when another student walked in on them, causing them to stop.

52. The alleged Incident culminated with Plaintiff ejaculating into a garbage can located in Jane Roe's residence hall room.

53. As Plaintiff prepared to ejaculate into the garbage can, Jane Roe walked up behind him, hugged him, rested her head on his back and joked "I don't want you to feel uncomfortable cumming into [my] garbage can."

54. After the Incident, Plaintiff and Jane Roe engaged in further conversation inside Jane Roe's residence hall room, before Plaintiff eventually left and began walking back to his residence hall room.

55. Jane Roe subsequently reported her allegations regarding the alleged Incident to a Case Western Reserve University Designated Reporting Representative affiliated with CWRU's Office of Title IX.

56. Jane Roe's allegation that Plaintiff performed oral sex on her without her consent is false because Plaintiff has never performed oral sex on her.

57. Jane Roe's allegation that Plaintiff engaged in sexual intercourse with her without her consent is also false because Plaintiff and Jane Roe engaged in consensual sexual intercourse at all times during the alleged Incident.

58. The CWRU Office of Title IX is currently in the process of conducting an investigation as to whether the Plaintiff violated the Sexual Misconduct Policy of CWRU based on Jane Roe's allegations regarding the alleged Incident.

59. On December 3, 2018, Ali Martin Scoufield, a Title Investigator from CWRU's Office of Title IX (hereinafter "Investigator Scoufield") emailed Plaintiff a letter advising him that the Office of Title IX received a report that alleged he engaged in non-consensual touching and non-consensual intercourse and that his behavior may fall under the CWRU Sexual Misconduct Policy.[19]

60. Said December 3, 2018 letter advised Plaintiff that he needed to meet with Investigator Scoufield and Title IX investigator Daniel Nemeth Neumann (hereinafter "Investigator Neumann") to discuss the report.[20]

---

[19] *Please see* December 3, 2018 letter attached hereto as Exhibit 2. *Please note* that Plaintiff has redacted his personal identifiers from said letter.
[20] *Id.*

61. On information and belief, Investigator Scoufield and Investigator Neumann are not lawyers and do not have extensive experience in questioning and/or cross-examining witnesses in adversarial proceedings.

62. In said December 3, 2018 letter, Investigator Scoufield expressed her desire to meet with Plaintiff within three (3) days.[21]

63. Investigator Scoufield advised Plaintiff in said letter that said meeting would be his opportunity to respond to the allegations, provide the names of witnesses, ask questions regarding the process, and assist her in completing a timely and thorough review.[22]

64. Investigator Scoufield, however, did not provide the Plaintiff with any information in said letter as to who made the allegation against him, when the allegations was said to have occurred, where the allegation was said to have occurred, and/or any of the alleged facts that gave rise to and/or consisted of the allegations against him.[23]

65. Said letter advised Plaintiff that he could bring an advisor to the meeting.[24]

66. Plaintiff subsequently retained legal counsel to serve as his advisor through the Title IX process.

67. The Plaintiff, through legal counsel, requested that the meeting with Investigators Scoufield and Investigator Neumann be scheduled on a date after December 12, 2018, after he completed his final exams.

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

68. Investigator Scoufield agreed to schedule said meeting for a date after December 12, 2018.

69. On December 11, 2018, Investigator Scoufield emailed Plaintiff a letter that advised him that Jane Roe was the student who filed the complaint accusing him of violating the University's Sexual Misconduct Policy.[25]  Said letter advised Plaintiff that he was to have no contact with Jane Roe for the duration of the investigation and until further notice.

70. On December 11, 2018, CWRU Title IX Coordinator Parker emailed Plaintiff a "Notice of Investigation" that advised him that CWRU student Jane Roe alleged that he performed oral sex on her on the morning of October 21, 2018 in her residence hall room without her consent.[26]

71. Said December 11, 2018 Notice of Investigation also advised Plaintiff that Jane Roe alleged that he engaged in sexual intercourse with her on the morning of October 21, 2018 in her residence hall room without her consent.[27]

72. CWRU Title IX Coordinator Parker advised Plaintiff in said Notice of Investigation that CWRU retained attorney Diane Citrino (hereinafter "Investigator Citrino") to serve at the title IX investigator in this matter and that "her team" from Giffen & Kaminski, LLC to investigate Jane Roe's allegations.[28]

---

[25] *Please see* December 11, 2018 letter from Investigator Scoufield, attached hereto as Exhibit 3.  *Please note* Plaintiff has redacted any personal identifiers of himself and/or Jane Roe form said letter.
[26] *Please see* December 11, 2018 Notice of Investigation, attached hereto as Exhibit 4. *Please note* Plaintiff has redacted any personal identifiers of himself and/or Jane Roe form said Notice.
[27] *Id.*
[28] *Id.*

73. The CWRU Defendants decision to retain Investigator Citrino and "her team" from Giffen & Kaminski, LLC further evidences the fact the CWRU Defendants are taking efforts that designed to ensure that the sexual misconduct panel determines that the Plaintiff is found to have violated the sexual misconduct policy

74. Giffen & Kaminski, LLC has recently defended a Title IX investigator from CWRU who was sued based on her involvement in a Title IX investigation that resulted in a male student at CWRU receiving a multi-year suspension from CWRU based on alleged sexual misconduct. See *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002 (N.D. OHIO), Case No. 1:17 CV 414.

75. Accordingly, Investigator Citrino and "her team" from Giffen & Kaminski, LLC have a clear conflict of interest as they have a potential financial interest in the outcome of the investigation and adjudicator process in the present matter and in all Title IX investigations at CWRU due to the possibility and/or likelihood that they will continue to be retained to defend CWRU employees and/or investigators from the Office of Title IX who are sued by students who are sanctioned under the Policy.

76. Thus, the CWRU Defendants decided to retain an outside investigator who has an inherent conflict of interest in these proceedings, rather than use the Title IX investigators and/or Designated Reporting Representatives from CWRU's Office of Title IX.

77. The CWRU Defendants are authorized by the Policy to retain an investigator from outside the university community to investigate an allegation of sexual misconduct:  1) depending on the number of ongoing investigations; and/or 2) the nature and complexity of the complaint.[29]

78. Neither of the conditions set forth in the Policy that would authorize the university to retain an investigator from outside the university community were applicable at the time the CWRU Defendants decided to retain Investigator Citrino.

79. On information and belief, there was not a such a significant number of ongoing investigations that the Office of Title IX lacked a Designated Reporting Representative and/or a Title IX investigator who was available to assist and/or handle the investigation.

80. On information and belief, at all times relevant herein, there were eleven (11) Designated Reporting Representatives, including two (2) Title IX Investigators in CWRU's Office of Title IX.

81. Pursuant to CWRU's 2018 Annual Security Report, during the three (3) year period between 2015 through 2017, there was total of ten (10) sex offenses involving CWRU students.

82. Thus, on information and belief, the CWRU Defendants' decision to retain Investigator Citrino was not based on the number of other ongoing Title IX investigations and the lack of Designated Reporting Representatives and/or Title IX investigators.

---

[29] CWRU Sexual Misconduct Policy, attached hereto as Exhibit 1.

83. Similarly, on information and belief, there was/is nothing complex about the nature of Jane Roe's complaint as she is alleging that the Plaintiff engaged in non-consensual sex with her.  The present matter would appear to be the typical she said/he said case as to whether the complaining witness consented to the respondent engaging in sexual activity with him and/or her.

84. Thus, the CWRU Defendants did not comply with the Policy when they made the decision to retain Investigator Citrino as the Title IX investigator in this matter.

85. Unlike CWRU Investigators Scoufield and Neumann, Investigator Citrino is a lawyer who is very skilled at cross-examination.

86. Investigator Citrino graduated from the University of California Berkeley's Boat Hall School of Law in 1982 and one her primary practice area for the past thirty-five (35) years is litigation and has earned and been recognized for numerous professional achievements in her career, such as being named to The Best Lawyers in America.[30]

87. Investigator Citrino is a partner at the law firm of Giffen & Kaminski, LLC, which advertises itself as a "women-owned firm", is certified by the Women's Business Enterprise as being at least 51%owned and/or controlled by one or more women and its website reflects that twelve (12) of the thirteen (13) attorneys at said firm are females.

88. Investigator Citrino has previously and/or currently serves as the Chair for the Ohio Advisory Committee to the U.S. Civil Rights Commission.

89. Due to her education, training, and experience, Investigator Citrino should

---

[30] *Please see* Diane Citrino's CV, attached hereto as Exhibit 5.

be viewed more as the equivalent of Title IX prosecutor who has been retained by the CWRU Defendants to ensure that the sexual misconduct panel determines that the Plaintiff violated the sexual misconduct policy than as a neutral, Title IX investigator.

90. CWRU Title IX Coordinator Parker advised Plaintiff that Investigator Citrino would contact him to arrange an interview.[31]

91. CWRU Title IX Coordinator Parker sent Plaintiff and Plaintiff's legal counsel and second email on December 11, 2018 in which he advised that he had become aware that Plaintiff had an investigator working on his behalf who was contacting people and students on CWRU's campus regarding Jane Roe's allegations of sexual misconduct.[32]

92. CWRU Title IX Coordinator Parker instructed Plaintiff and Plaintiff's legal counsel to have their investigator cease contacting people and students on CWRU's campus.[33]

93. CWRU Title IX Coordinator Parker objected to Plaintiff having an investigator contacting people and students on CWRU's campus regarding Jane Roe's allegations because it expanded the number of people that the Office of Title IX would have to talk to regarding the information that they had in place and could be considered interfering with the university process.[34]

---

[31] December 11, 2018 Notice of Investigation, attached hereto as Exhibit 4.
[32] December 11, 2018 email from CWRU Title IX Coordinator Parker, attached hereto as Exhibit 6.
[33] *Id.*
[34] *Id.*

94. The fact that CWRU Title IX Coordinator Parker complained about the fact that the number of people that the Title IX office would have to speak to regarding Jane Roe's allegations and/or the Plaintiff's defense to said allegations expanded evidences the fact that the CWRU Defendants have no intentions of investigating allegations of sexual misconduct in a thorough manner as required by the Policy and as promised to the complainant and the Respondent.

95. CWRU Title IX Coordinator Parker's complaint about the Title IX office having to interview additional witnesses during its investigation evidences the fact that the CWRU Defendants refuse to consider the fact that a complainant might fabricate his and/or her allegations against a respondent for an ulterior motive and that the CWRU Defendants efforts are designed to ensure that the sexual misconduct panel determines that a respondent is found to have violated the sexual misconduct policy.

96. CWRU Title IX Coordinator Parker also objected to Plaintiff having an investigator contacting people and students on CWRU's campus regarding Jane Roe's allegations because the parents of the CWRU students who were contacted may be concerned and would contact the university with their concerns.[35]

97. CWRU Title IX Coordinator Parker's objection further evidences the fact that the CWRU Defendants are more concerned with receiving a complaint from the parent of a CWRU student who was interviewed regarding their knowledge as to whether another student engaged in non-sexual activity than as to whether a student actually violated the sexual misconduct policy.

---

[35] *Id.*

98. The CWRU Sexual Misconduct Policy does not prohibit a respondent in Title IX cases from having private investigators and/or their advisor of choice, and/or their legal counsel from contacting potential witnesses who may have knowledge of information and/or evidence that can assist the respondent's defense to a complaining witness's allegations.[36]

99. On information and belief, the CWRU Defendants normally release a copy of the complaining witness's written statement to the respondent and/or the respondent's advisor of choice prior to the respondent meeting with any Title IX representatives so that the respondent can prepare for the initial meeting with the Title IX representative.

100.     Plaintiff's legal counsel asked CWRU Title IX Coordinator Parker if he would release a copy of Jane Roe's statement to him prior to Plaintiff meeting with the Investigator Citrino.

101.     CWRU Title IX Coordinator Parker advised Plaintiff's legal counsel that he would leave that decision to Investigator Citrino and that it would be in Investigator Citrino's discretion as to when to release Jane Roe's written statement.

102.     On December 13, 2018, Plaintiff's legal counsel emailed Investigator

---

[36] CWRU Sexual Misconduct Policy, attached hereto as Exhibit 1.

Citrino asking if she would be willing to release Jane Roe's written statement prior to the initial meeting that was scheduled between Investigator Citrino and Jane Roe on December 21, 2018.

103.    Investigator Citrino advised that she would not release Jane Roe's statement prior to the December 21, 2018 meeting.

104.    Investigator Citrino's decision to withhold Jane Roe's statement prior to the December 21, 2018 meeting is designed to ensure that the sexual misconduct panel determines that a respondent is found to have violated the sexual misconduct policy.

105.    By refusing to disclose Jane Roe's statement in advance of the December 21, 2018 meeting, Investigator Citrino is purposefully preventing the Plaintiff from having a meaningful opportunity to review Jane Roe's statement with his advisor prior to Investigator Citrino attempting to question Plaintiff regarding Jane Roe's statements.

106.    Investigator Citrino's decision to not produce Jane Roe's statement in advance of the December 21, 2018 meeting further reflects how fundamentally unfair CWRU's Title IX proceedings are in this matter and how said proceedings are designed to ensure that the sexual misconduct panel determines that a respondent, such as Plaintiff, is found to have violated the sexual misconduct policy, especially considering the fact that Investigator Citrino has been a litigation attorney for twice as long as Plaintiff has been alive.

107.    In an alleged sexual misconduct case where there are no

independent eyewitness to the alleged conduct, such as the present matter, and where the panel is only required to find that it is more likely than not that the sexual misconduct policy was violated, the alleged credibility and/or non-credibility of the complaining witness and/or the respondent is outcome determinative.

108.     The only logical explanation as to why Investigator Citrino and/or the CWRU Defendants would refuse to disclose the Jane Roe's detailed allegations against the Plaintiff until the December 21, 2018 meeting is to attempt to have the Plaintiff come across as less credible as the Jane Roe.

109.     As Investigator Citrino is required to appear the sexual misconduct hearing in this matter and answer questions from the panel, if she forms an opinion that the Plaintiff was not as credible as Jane Roe, the panel is likely to give great weight to her testimony since she is a very accomplished lawyer.

110.     While the CWRU Defendants have yet to sanction Plaintiff based on Jane Roe's allegations because their investigation in ongoing, the CWRU Defendants have made a determination that Jane Roe's allegations fall within the Policy, have retained an investigator from outside the university to serve as the Sexual Misconduct Investigator in this matter, and have determined that the process should proceed by the Formal Process to a Board Hearing with the university's Sexual Misconduct Panel.

111.     Plaintiff respectfully asserts that the CWRU Defendants have deprived the Plaintiff of basic fairness and a level of fair play during the Title IX investigation by instructing him to cease having his private investigators speak to

potential witnesses and to withhold the complaining witness's written statement from him prior to the initial meeting at which time Investigator Citrino will question him regarding the Jane Roe's allegations and that he will suffer irreparable harm if the CWRU Defendants are permitted to continue with the investigation and adjudicatory process against him under the Policy and current procedures and with Investigator Citrino and "her team" handling said investigation.

## FIRST CAUSE OF ACTION – VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – ERRONEOUS OUTCOME - AS TO DEFENDANTS CWRU AND CWRU BOARD OF TRUSTEES

112.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

113.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

114.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

115.     Upon information and belief, Defendant CWRU receives federal funding for research and development.

116.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student … complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.  34 C.F.R. § 106.8(b) Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of

Justice) (*emphasis added*).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[37]

117.     In 2001, the Office of Civil Rights issued the "Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

118.     According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "*[accord] due process to both parties involved...*"[38]

119.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice ... of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment ..."

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonable prompt timeframes for the major states of the complaint process"; and

- "Notice to the parties of the outcome of the complaint ...."[39]

---

[37] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21 & nn.98-101.
[38] Id. at 22 (emphasis added).
[39] *Id.* at 20.

120.     A school also has an obligation under Title IX to make sure that all employees involved in the conduct procedures have "adequate training as to what constitutes sexual harassment, which includes "alleged sexual assaults."[40]

121.     The Sixth Circuit recognizes a private cause of action under Title IX "where a plaintiff alleges that an educational institution implemented disciplinary actions that discriminated against the plaintiff based on sex." *Mallory v. Ohio Univ.,* 76 F. App'x 634, 638-39 (6th Cir. 2003), citing *Yusuf v. Vassar College,* 35 F.3d 709 (2nd Cir. 1994).

122.     Title IX claims arising from university disciplinary proceedings are analyzed under one or more of the following four standards:  erroneous outcome, selective enforcement, deliberate indifference, or archaic assumptions.  *Doe v. Univ. of the S.,* 687 F.Supp.2d 744, 756 (E.D. Tenn. 2009).

123.     Defendant CWRU failed to conduct an adequate, reliable, and impartial "initial inquiry" as required by the Policy prior to determining that Jane Roe's complaint fell within the Policy and that the matter should be referred to a "Sexual Misconduct Investigator."

124.     Pursuant to the Policy, an "initial inquiry" is to be conducted when a complaint of alleged sexual misconduct is received.[41]

125.     The Policy requires that the "initial inquiry" be conducted by the

---

[40] *Id.* at 21.
[41] CWRU Sexual Misconduct Policy, attached hereto as Exhibit 1, at p.13.

Designated Reporting Representative/Title IX Coordinator and generally include interviews with the complainant and the respondent and a review of relevant documents.[42]

126.    Per the Policy, following the initial inquiry, the Title IX Coordinator will determine whether information gathered during the initial inquiry indicates that the complaint falls within the Policy.[43]

127.    If the Title IX Coordinator determines that the complaint falls within the Policy, the Designated Reporting Representative will either: 1) proceed with the Informal Process; or 2) refer the matter to the Sexual Misconduct Investigator/Title IX Coordinator for a determination as to whether the process should proceed to the Informal process, the Formal Process, or another University Process.[44]

128.    In the present matter, the Designated Reporting Representative/Title IX Coordinator spoke with Jane Roe and/or reviewed a written statement prepared by Jane Roe in determining that Jane Roe's complaint fell within the Policy, that the matter should be referred to a Sexual Misconduct Investigator, and that the process should proceed by the Formal Process.

129.    In the present matter, the Designated Reporting Representative/Title IX Coordinator failed to interview Plaintiff as part of the initial inquiry process prior to making the determination that Jane Roe's complaint fell within

---

[42] *Id.*
[43] *Id.* at p.16.
[44] *Id.*

the Policy, that the matter should be referred to a Sexual Misconduct Investigator, and that the process should proceed by the Formal Process.

130.     Defendant CWRU's one-sided process as it relates to the initial inquiry and the determination that Jane Roe's complaint fell within the Policy, that the matter should be referred to a Sexual Misconduct Investigator, and that the process should proceed by the Formal Process, deprived Plaintiff, as a male student, of educational opportunities at CWRU and/or his rights CWRU's Sexual Misconduct Policy on the basis of his sex.

131.     Defendant CWRU erroneously found that the Title IX investigation in this matter should proceed past the "initial inquiry" despite there being any reliable and/or credible evidence and/or without providing John Doe with an opportunity to speak/interview with the Designated Reporting Representative/Title IX Coordinator.

132.     Defendant CWRU applied its stated policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome that Jane Roe's complaint fell within the Policy, that the matter should be referred to a Sexual Misconduct Investigator, and that the process should proceed by the Formal Process.

133.     Specifically, the CWRU Defendants failed to afford Plaintiff a presumption of innocence when they made the decision that Jane Roe's complaint fell within the Policy, that the matter should be referred to a Sexual Misconduct Investigator, and that the process should proceed by the Formal Process.

134.     Upon information and belief, CWRU possesses communications

evidencing the CWRU Defendants' inclination to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

135.    For instance, CWRU's had previously employed Shannon Greybar Milliken as its Deputy IX Coordinator and Assistant Director of Student Affairs.

136.    Though Ms. Milliken was charged with the responsibility of acting as an impartial factfinder, her views of males as the aggressors in sexual encounters was apparent in her doctoral dissertation "The Dangerous Reality:  Sexual Risk Taking Among College Women" which focused on the detrimental effects of women engaging in casual sex in college, including depression and eating disorders.  Ms. Milliken concluded that "we have an epidemic in higher education regarding the sexual risk taking of college students, in particular women."

137.    Upon information and belief, even though Ms. Milliken is no longer employed by CWRU as its Deputy IX Coordinator and Assistant Director of Student Affairs, CWRU continues to demonstrate a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

138.    Upon information and belief, all students that have been suspended from CWRU for sexual misconduct have been male.

139.    Upon information and belief, CWRU's mishandling of Plaintiff's investigation to date was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

140.    Upon information and belief, information concerning the outcome

of disciplinary proceedings, involving males as compared to female students, is in the exclusive control and possession of the CWRU Defendants.  Upon further information and belief, such statistics will demonstrate a pattern of intentional discriminatory conduct and disproportionate findings of responsibility imposed on male students.

141.    Based upon the forgoing, male respondents accused of sexual misconduct at CWRU are discriminated against solely on the basis of sex.

142.    Based upon the forgoing, Plaintiff has been subjected to a biased, prejudiced, and explicitly unfair process in violation of Title IX.

143.    As a direct and proximate result of the above conduct, Plaintiff has sustained and will continue to sustain damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

144.    As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION – VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – SELECTIVE ENFORCEMENT - AS TO DEFENDANTS CWRU AND CWRU BOARD OF TRUSTEES

145.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

146.    Jane Roe has communicated to at least one mutual acquaintance of hers and Plaintiffs that she did not consent to said sexual conduct due to her being under the influence of marijuana.

147.     To the extent that the CWRU Defendants are continuing to pursue the sexual misconduct investigation in this matter and are subjecting Plaintiff to a process where he could face a significant sanction, including but not limited to being suspended and/or expelled from CWRU, when both he and Jane Roe smoked marijuana prior to the alleged sexual conduct, marijuana that was purchased by and provided to the Plaintiff by Defendant Zoe, and when Plaintiff was a minor at the time of the alleged conduct and on information and belief, Jane Roe was eighteen (18) years old, is further evidence that CWRU is impermissibly selectively enforcing its sexual conduct policy in this matter based on Plaintiff being a male.

148.     The CWRU Defendants have been selective in enforcing and/or requiring Plaintiff and Jane Roe to abide by the requirements of Policy during the Title IX investigation process.

149.      During the title IX investigation process, the Policy requires that Defendant CWRU is responsible for assuring the rights of the complainant and the respondent be maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy.[45]

150.     The Policy provides that the complainant and the respondent have the right to confidentiality during the title IX investigation process.[46]

151.     The Policy also provides that the complainant and the respondent have the right to have the allegations investigated in a thorough and timely manner.[47]

152.     In addition, the Policy also requires that Defendant CWRU is to

---

[45] CWRU Sexual Misconduct Policy, attached as Exhibit 1, at p.13.
[46] *Id.*
[47] *Id.*

provide the complainant and the respondent with access to support resources listed in the Policy.[48]

153.    The Policy requires all parties and witnesses to maintain the confidentiality of the process.

154.    Despite the fact that the Policy provides a complainant and a respondent with the same basic rights, the CWRU Defendants have treated Jane Roe more favorably to date than they have Plaintiff.

155.    For example, the CRWU Defendants have permitted and/or acquiesced to Jane Roe and fellow female students that she has confided in and who are the CWRU Defendants know are witnesses in the Title IX investigation to discuss the status of the investigation with each other and to discuss and/or talk about Jane Roe's allegations against Plaintiff.

156.    Whereas, the CWRU Defendants have requested that Plaintiff cease speaking with other CWRU students about the Title IX investigation and Jane Roe's allegations against him and to cease having his private investigators contacting CWRU students about Jane Roe's allegations and the Title IX investigation.

157.    In addition, on information and belief, the CWRU Defendants timely offered and/or provided and/or advised Jane Roe that there were support resources available to her, including appropriate academic supports, such as tutoring, or permission to withdraw from or retake a class or classes, the CWRU Defendants did not advise Plaintiff that any support resources were available to him until after he completed most and/or all of his final exams.

---

[48] *Id.*

158.     Further, while the Policy provides that a Designated Reporting Representative/Title IX Coordinator is to conduct the initial interview of the complainant and the respondent, the CWRU Defendants have selectively permitted Jane Roe to be interviewed by a Designated Reporting Representative/Title IX Coordinator, who is non-lawyer and university employee, while requiring Plaintiff to be interviewed by Investigator Citrino, a skilled trial lawyer for more than thirty-five years,[49] who is not an employee of the university.

159.     Based upon the forgoing, Plaintiff has been subjected to a biased, prejudiced, and explicitly unfair process in violation of Title IX.

160.     As a direct and proximate result of the above conduct, Plaintiff has sustained and will continue to sustain damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

161.     As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS PROPERTY AND LIBERTY INTERESTS AS TO DEFENDANTS PARKER AND CWRU DOE DEFENDANTS 1-10

162.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

163.     The Fourteenth Amendment to the United States Constitution

---

[49] Diane Citrino CV, attached hereto as Exhibit 5.

provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

164.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

165.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

166.    On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

167.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under the detailed procedures and terms dictated by the federal government.

168.    If the Federal Government were to impose defunding penalties on CWRU, said penalties would be significant as, on information and belief, as since 2014, the the Federal Government has provided CWRU's school of medicine with approximately $765,000,000.00 in funding and CWRU's school of engineering with approximately $239,000,000.00 in funding.

169.    For example, and without limitation, as a result of the Dear

Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

a) Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

b) Required to establish a coordinated and centralized investigative and adjudicative procedure according to the detailed rules mandated by the federal government and headed by a Title IX coordinator;

c) Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

d) Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

e) Required not to allow cross-examination by the accused student;

f) Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

170.    Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter. For example, in July 2014, former DOE Assistant Secretary for the Civil Rights Catherine Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think its an empty threat," Lhamon warned.

171.    Upon information and belief, since 2011 CWRU has revised its

policies in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties.

172.    On information and belief, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, the number of forcible sex offenses reported on CWRU's campus have increased significantly since 2011.

173.    The Dear Colleague Letter has resulted in significant action and legal consequences; former Assistant Secretary for the Office of Civil Rights Catherine Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

174.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Defendant Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools;" Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

175.    In fact, Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government." Concerning why there is a higher volume of complaints being made to the Office of Civil Rights, Secretary Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." http://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained

176.     Accordingly, CWRU was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

177.      CWRU has been applying the investigative and adjudicatory process dictated to it by the federal government in its investigation into Jane Roe's sexual assault complaint against Plaintiff.

178.     Under clear and controlling federal constitutional case law, a private actor becomes a state actor when his or its actions are coerced by the United States government.

179.     Under clear and controlling federal constitutional case law, a private actor required by the Untied States to investigate and adjudicate alleged violations of federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

180.     Accordingly, CWRU is a state actor during its investigation into Jane Roe's complaint against Plaintiff and is therefore required to honor the rights and guarantees set forth in the United States Constitution during said investigation and adjudication.

181.     In the course of CWRU's investigation and its stated process and procedures for adjudication as set forth in the Policy, CWRU has flagrantly violated and intends to flagrantly violate Plaintiff's clearly established constitutional rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

182.     The CRWU Defendants have deprived and continue to deprive

Plaintiff of his liberty and property interests without affording him basis due process,

including, but not limited to: his right to fair adjudication, his right to be informed of the

exact charges against him, his right to be heard by an impartial factfinder, to question his

accuser through cross-examination, to review all witness statements and evidence against

him prior to meeting with any Title IX representatives and/or prior to any adjudicatory

hearing, to challenge the credibility of other adverse witnesses, to investigate Jane Roe's

allegations by questioning and/or interviewing potential witnesses, and to present

evidence and witnesses in support of his defense. Rather than investigate what allegedly

occurred on October 21, 2018, the Defendants have conducted a superficial investigation

biased against Plaintiff as a male accused of sexual assault and have requested that he

cease attempting to investigate the allegations against him by speaking with other

students who likely have knowledge about Jane Roe's allegations.

183. As a result, the CWRU Defendants have failed to provide Plaintiff

with the basic due process protections that they are required to provide students accused

of sexual misconduct, in violation of the Fourteenth Amendment.

184. Based on the forgoing, CWRU was a state actor when it violated

the rights and guarantees set forth in the Fourteenth Amendment of the United States

Constitution during the investigation of Jane Roe's complaint against Plaintiff.

185. As a result of these due process violations, Plaintiff continues to

suffer ongoing harm, including damages to his reputation and other non-economic and

economic damages.

186. Accordingly, the CWRU Defendants are liable to Plaintiff for

violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

187.     As a direct and proximate result of the above conduct, Plaintiff has sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

188.     As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## <u>FOURTH CAUSE OF ACTION – BREACH OF CONTRACT</u>

189.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

190.     At all times relevant hereto, a contractual relationship existed between CWRU and Plaintiff through CWRU's policies and procedures governing the student disciplinary system, including but not limited to the sexual misconduct policy.

191.     Through the documents it publishes and provides to students, CWRU makes express contractual commitments to students involved in a disciplinary process.

192.     CWRU promises students "[t]he university does not discriminate on the basis of sex in its educational program and in other activities operated by the university and is required by Title IX, and specifically 34 C.F.R. Part 106.9, as well as Title VII, not to discriminate in such a manner." The Policy further guarantees "[t]he

University is responsible for assuring that the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy." Moreover, CWRU promises to "respect the rights of all involved by following the stated university sexual misconduct process" and "have the allegations investigated in a thorough and timely manner." Plaintiff performed his obligations under the contract when he accepted an offer of admission from CWRU and paid any required tuition, fees, and/or room and board to CWRU.

193.    Based on the forgoing, CWRU created express and implied contracts with Plaintiff.

194.    Based on the aforementioned facts and circumstances, Defendant CWRU breached express and/or implied agreement(s) with Plaintiff.

195.    Based on the forgoing, CWRU materially breached its contract with Plaintiff by failing to provide a fair process for the handling of sexual misconduct matters", failing to give adequate and timely notice of the allegations against him, failing to perform a fair, thorough and non-discriminatory investigation, and in failing to comply with its policies and procedures.

196.    Defendant CWRU committed several breaches of its agreements with Plaintiff during the investigation process, including for instance:

**Failure to Afford Plaintiff a Fair Process**

197.    CWRU's Policies provide that the University is responsible for assuring that the rights of the complainant and the respondent are maintained by supporting a fair process.

198.     CWRU violated its contract with Plaintiff when by conducting a biased, prejudiced, and implicitly unfair process, that is calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged, employed biased investigators and a biased investigative team from outside the university community, and deprived Plaintiff of his procedural rights throughout the investigation process.

199.     Accordingly, Defendant CWRU violated its contract with Plaintiff by conducting a procedurally flawed, biased, and subjective investigation on the allegations against him and made a determination that Jane Roe's allegations fall within the Policy, have retained an investigator from outside the university to serve as the Sexual Misconduct Investigator in this matter, and having determined that the process should proceed by the Formal Process to a Board Hearing with the university's Sexual Misconduct Panel without interviewing him as part of the "initial inquiry" process required by the Policy.

**Failure to Advise and Provide Plaintiff with Support Resources**

200.     CWRU's Policies provide that the respondent is guaranteed access to support resources listed in the Policy.

201.     Yet, Plaintiff was not informed by the CWRU Defendants about academic accommodations until late in the afternoon on December 12, 2018, after he had completed all and/or substantially all of his final exams.

202.     Accordingly, Defendant CWRU violated its contract with Plaintiff when it failed to afford him and advise him that proper support resources and accommodations were available to him.

## FIFTH CAUSE OF ACTION – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

203.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

204.  Based on the aforementioned facts and circumstances, Defendant CWRU acted in bad faith when it meted out an erroneous decision that notwithstanding the flawed investigative process and lack of evidence in support of Jane Roe's allegations of sexual misconduct.

205.  Based on the aforementioned facts and circumstances, Defendant CWRU breached and violated a covenant of good faith and fair dealing implied in the agreements with Plaintiff.

206.  As a direct and foreseeable consequence of these breaches, Plaintiff sustained damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

207.  Plaintiff is entitled to recover damages for CWRU's breach of the express and/or implied contractual obligations described above.

208.  As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

209.  As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## SIXTH CAUSE OF ACTION - NEGLIGENCE

210.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

211.     The CWRU Defendants owe a duty of care to Plaintiff, arising from the obligations delineated in CWRU's Policies, and directives issued by the U.S. Department of Education's Office for Civil Rights.  Such duties included, without limitation, a duty of reasonable care to allow Plaintiff an equal opportunity to present information and witnesses in support of his defense; a duty to conduct an impartial and thorough investigation into the allegations of sexual misconduct against him.

212.     Based on the forgoing, the CWRU Defendants breached their duties owed to Plaintiff.

213.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

214.     As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## SEVENTH CAUSE OF ACTION – PROMISSORY ESTOPPEL

215.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

216.     CWRU'S Policies constitute unambiguous representations and

promises that CWRU should have reasonably expected to induce action or forbearance on the part of Plaintiff.

217.     CWRU expected or should have expected Plaintiff to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including but not limited to:  CWRU would not deny Plaintiff his procedural rights should he be accused of a violation of CWRU's policies; CWRU was committed to providing support to anyone involved in an incident of sexual misconduct; the University would ensure the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy; and the University would respect the rights of all involved by following the stated university sexual misconduct process.

218.     Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by CWRU, by choosing to attend CWRU rather than other schools of equal caliber.

219.     These express and implied promises and representations made by CWRU must be enforced to prevent substantial injustice to Plaintiff.

220.     Based on the forgoing Plaintiff is liable to Plaintiff based on Promissory Estoppel.

221.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

222.     As a result of the forgoing, Plaintiff is entitled to damages in an

amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## DECLARATORY JUDGMENT

223.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

224.    CWRU has committed numerous violations of the Parties' contracts and of federal and state law.

225.    Without appropriate redress, the unfair investigation and adjudicatory process will continue and cause irreversible damages to Plaintiff's future educational and employment prospects, with no end in sight.

226.    As a result of the forgoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at CWRU.

227.    By reason of the forgoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that:  1) any record of Jane Roe's complaint against Plaintiff and/or investigation into Jane Roe's complaint against Plaintiff be destroyed; and 2) CWRU's rules, regulations, and guidelines, in the Policy are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the forgoing reasons, Plaintiff demands judgment against the Defendants as follows:

1) An injunction from this Honorable Court halting the investigation and decision-making process with regard to Jane Roe's allegations against Plaintiff because CWRU's Title IX investigation process is unconstitutional and deprives Plaintiff of due process;

2)  An injunction from this Honorable Court prohibiting the CWRU Defendants from further use of the Sexual Misconduct Policy as to any student because said Policy is unconstitutional and is a deprivation of due process rights;

3)  A ruling that, as a matter of law, Plaintiff's due process rights have been violated by the CWRU Defendants;

4)  Whatever other equitable relief appears appropriate at the time of final judgment;

5)  On Plaintiff's First and Second Causes of Action, which are causes of action against Defendant CWRU and Defendant CWRU Board of Trustees for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

6)  On Plaintiff's Third Cause of Action, which is a cause of action against Defendant Parker and CWRU Doe Defendants 1-10 for violation of Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution to Procedural Due Process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

7)  On Plaintiff's Fourth Cause of Action, which is a Cause of Action for breach of

contract against Defendant CWRU and Defendant CWRU Board of Trustees, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

8) On Plaintiff's Fifth Cause of Action, which is a cause of action against Defendant CWRU and Defendant CWRU Board of Trustees, for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

9) On Plaintiff's Sixth Cause of Action for negligence, which is cause of action against all of the CWRU Defendants, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

10) On Plaintiff's Seventh Cause of Action for promissory estoppel, which is a cause of action against Defendant CWRU and Defendant CWRU Board of Trustees, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to the physical well-being, emotional and psychological

damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

11) Awarding Plaintiff such other and further relief as this Honorable Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Respectfully Submitted,

/s/ Brian A. Murray
LARRY W. ZUKERMAN, Esq. (0029498)
PAUL B. DAIKER, Esq. (0062268)
BRIAN A. MURRAY, Esq. (0079741)
Zukerman, Daiker & Lear, Co. L.P.A.
3912 Prospect Ave., East
Cleveland, Ohio 44115
(216) 696-0900 telephone
(216) 696-8800 facsimile
lwz@zukerman-law.com
pbd@zukerman-law.com
bam@zukerman-law.com
Counsel for Plaintiff John Doe

| STATE OF OHIO | ) | | |
|---|---|---|---|
| | ) | ss. | AFFIDAVIT |
| CUYAHOGA COUNTY | ) | | |

The undersigned, being first duly sworn according to law, hereby deposes and states:

1.  I am a Plaintiff in the within matter;

2.  I am over the age of 18 years and I resided at all times relevant herein, in Cuyahoga County, Ohio;

3.  I have personal knowledge of the facts set forth in the Verified Complaint herein;

4.  The averments and allegations set forth herein are true and accurate as I verily believe.

FURTHER AFFIANT SAYETH NAUGHT.

SWORN TO BEFORE ME and subscribed in my presence this 20th day of December, 2018 by _____ who appeared before me and, after being duly cautioned according to law, executed this document in CUYAHOGA COUNTY, OHIO.

NOTARY PUBLIC

BRIAN A. MURRAY, Atty.
NOTARY PUBLIC · STATE OF OHIO
My commission has no expiration date
Section 147.03 O.R.C.



# Sexual Misconduct Policy

## Case Western Reserve

## University



DIVISION OF STUDENT AFFAIRS

CASE WESTERN RESERVE
U N I V E R S I T Y



EXH

# SEXUAL MISCONDUCT POLICY

Case Western Reserve University
Table of Contents

|  | Page |
|---|---|
| Introduction | 3 |
| Definition and Examples | 4 |
|    Sexual Harassment | 4 |
|    Sexual Exploitation | 5 |
|    Non-Consensual Sexual Contact or Activity | 5 |
|    Forced Sexual Contact or Activity | 5 |
|    Non-Consensual Sexual Intercourse | 6 |
|    Forced Sexual Intercourse | 6 |
|    Intimate Partner Violence | 6 |
|    Stalking | 6 |
| Additional Applicable Definitions | 7 |
|    Unwelcome Behavior | 7 |
|    Consent and Incapacitation | 7 |
|    Coercion | 7 |
|    Force | 8 |
| Relevant Considerations | 8 |
|    Relationships Involving Authority or Power | 8 |
|    Intention vs. Impact | 8 |
|    Academic Freedom | 8 |
| Reporting | 9 |
|    Designated Reporting and Confidential Support Resources | 9 |
|    Role of Designated Reporting Representatives | 9 |
|    Role of Confidential Support Resources | 10 |
|    Police Resources | 11 |
|    Anonymous Reports | 11 |
| Confidentiality & Retaliation | 11 |
|    Confidentiality and Privacy | 11 |
|    Retaliation | 12 |
| Responsibilities of the University Community | 12 |
|    Reporting Responsibility | 12 |
|    Cooperating with Investigations | 13 |
|    Police Responsibility | 13 |
|    Support of Witnesses and Bystanders | 13 |
|    University's Investigative Responsibility | 13 |
|    University's Responsibility to Support a Fair Process and the Rights of the Complainant and Respondent | 14 |
| Notifications | 14 |
|    Parental/Legal Guardian/Partner Notification | 14 |
|    Federal Timely Warning Obligations | 14 |
|    Federal Statistical Reporting Obligations | 14 |
| Student, Faculty & Staff Sexual Misconduct Complaint Process (Flow Chart) | 15 |
| University Complaint Processes | 16 |
|    Time Table | 16 |
|    Initial Inquiry | 16 |
|    Interim University Actions | 16 |

Role of the Designated Reporting Representative and/or Sexual Misconduct Investigator(s) _____ 17

    Informal Process _____ 17

        Step 1 – Facilitate Resolution _____ 17

        Step 2 – Document Informal Resolution _____ 18

    Formal Process _____ 18

        Determination of Administrative Hearing vs. Board Hearing _____ 19

        University Role to Address Violations of Policy via Formal Process _____ 19

        Formal Process: Administrative Hearing _____ 20

        Administrative Hearing Procedure _____ 20

        Administrative Hearing Appeal Process _____ 20

    Formal Process: University Community Standards Board _____ 21

        Pre-Hearing Procedure _____ 21

        Hearing Procedure _____ 22

        Report of Findings _____ 23

        Appeal Process _____ 24

        Additional Faculty Sanctions _____ 24

False Allegations _____ 25

Support Resources _____ 25

    Alternative Housing & Academic Accommodations _____ 25

    Counseling _____ 25

    Emergency Room Examination/Preservation of Evidence _____ 25

    University Health and Counseling Services_____ 25

Retention of Documents_____ 26

    Informal Complaints_____ 26

    Formal Complaints_____ 27

Annual Report _____ 27

Prevention, Education & Training _____ 27

Appendix A _____ 28

Position Descriptions _____ 29

    Title IX Coordinator _____ 29

    Deputy Title IX Coordinator _____ 29

    Designated Reporting Representative _____ 29

    Title IX Investigator _____ 29

Other Sources for Information _____ 29

# ACKNOWLEDGEMENT

Significant portions of this policy have been adapted from the National Center for Higher Education Risk Management Group, LLC (*NCHERM*) *Model Title IX Compliance Policy, Grievance Process and Civil Rights Investigation Protocol* (2014) and are used as permitted by NCHERM.

# Introduction

Case Western Reserve University is a community based upon trust and respect for its constituent members. Sexual misconduct is a violation of that trust and respect and will not be tolerated.  Members of the Case Western Reserve community, guests and visitors have the right to be free from sexual misconduct, as well as domestic violence, dating violence and stalking.  All members of the community are expected to conduct themselves in a manner that does not infringe upon the rights of others.  The purpose of this policy is to define sexual misconduct and the procedures the university uses to investigate and take appropriate action on complaints of sexual misconduct.  When complaints are reported, the university will act to end the discrimination, prevent its recurrence, and remedy the effects on both individuals and the university community. This policy and the accompanying procedures shall serve as the only internal university forum of resolution and appeal of sexual misconduct complaints.

This policy applies to all members of the university community including all students, Post-Doctoral Fellows and Post-Doctoral Scholars, faculty, staff (including administrators), and other university officials, whether full or part-time, and guest lecturers, volunteers, contractors and visitors.  This Policy is applicable to a student on the date on which the student accepts admission to the University.

This policy governs university-sponsored activities occurring both on and off university property and applies to non-university sponsored or related events that occur off university property that may have a demonstrable and significant disruptive impact on a university community member or on the campus.  The work or educational environment includes, but is not limited to: offices, classrooms and clinical settings; residence halls and Greek Houses; on-campus or off-campus interactions between university community members, whether personal or virtual; and all university-sponsored activities, programs, or events (including off-campus activities such as international travel programs).

Sexual misconduct may involve the behavior of a person(s) regardless of the person's gender identity or expression against a person(s) of the opposite or same gender or against a person who is transsexual or transgender.

The university does not discriminate on the basis of sex in its educational program and in other activities operated by the university and is required by Title IX, and specifically 34 C.F.R. Part 106.9, as well as Title VII, not to discriminate in such a manner.  This extends to employees of and applicants for employment or admission to the university.  Inquiries concerning the application of Title IX may be directed to the Title IX Coordinator for the university or to the Assistant Secretary for the Office of Civil Rights of the Department of Education.
The Title IX Coordinator is:

Darnell T. Parker
Associate Vice President Student Affairs
University Title IX Coordinator
Adelbert Hall 110
10900 Euclid Avenue
Cleveland, Ohio  44106
216-368-2020
darnell.parker@case.edu
http://www.case.edu/title-ix/

The role, names and contact information for the Title IX Coordinator, Designated Reporting Representatives, and Investigators are listed in Appendix A, along with contact information for the Office of Civil Rights of the Department of Education.

## Definitions and Examples

Misconduct that falls within this policy includes:

### Sexual Harassment

Sexual harassment is defined as any unwelcome verbal or non-verbal sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature, and/or conduct directed at an individual(s) because of gender when:

1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or student status; or

2. Submission to or rejection of such conduct is used as the basis for decisions affecting that individual with regard to employment (raises, job, work assignments, discipline, etc.) or to student status (grades, references, assignments, etc.); or

3. Such conduct has the purpose or effect of unreasonably and objectively interfering with an individual's work performance or educational experience or creates an intimidating, hostile, or offensive work and/or educational environment. Such conduct generally involves more than one incident and must be severe, persistent or pervasive (or may be severe, persistent and pervasive).  Depending on the nature of the incident, more than one action or incident is typically necessary to constitute this form of sexual harassment.

Acts that constitute sexual harassment take a variety of forms and may include but are not limited to the following unwelcome actions:

    a. Propositions, invitations, solicitations, and flirtations of a sexual nature.

    b. Threats or insinuations that a person's employment, wages, academic grade, promotional opportunities, classroom or work assignments, or other conditions of employment or academic life may be adversely affected by not submitting to sexual advances.

    c. Verbal expressions of a sexual nature, including sexual communications about a person's body, dress, appearance or sexual activities; the use of sexually degrading language, name calling,  sexually suggestive jokes, or innuendoes;  suggestive or insulting gestures, sounds or whistles; sexually suggestive phone calls.

    d. Sexually suggestive objects or written materials, such as social media, e-mail or internet communications, pictures, photographs, cartoons, text messages, videos, or DVD's.

    e. Inappropriate and unwelcome physical contact such as touching, patting, pinching, hugging or other sexually suggestive contact.

    f. Stalking of a sexual nature (i.e. persistent and unwanted contact of any form whether physical, electronic or by any other means). For stalking to fall within this policy, the content or the nature of the stalking must have a sexual component.

    g. Stereotyping or generalizing about a group based on gender.  These types of comments typically constitute sexual harassment when associated with other sexual behavior or comments.

While a particular interaction must be offensive to both a reasonable person and to the complainant to be defined as harassment, faculty and staff members and other persons of authority should be sensitive to questions about mutuality of consent that may be raised and to the conflict of interests that are inherent in personal relationships that result from professional and educational interactions. Harassment is particularly damaging when it exploits the educational dependence and trust between students and faculty/staff. When the authority and power inherent in faculty/staff relationships with students, whether overtly, implicitly, or through misinterpretation, is abused in any way, there is potentially great damage to the individual student, to the accused individual, and to the climate of the institution.

## Sexual Exploitation

Occurs when an individual takes non-consensual, unjust or abusive sexual advantage of another; for his/her own advantage or benefit; or to benefit or advantage anyone other than the one being exploited; and that behavior does not otherwise constitute non-consensual sexual contact, non-consensual sexual intercourse or sexual harassment.  Sexual exploitation includes, but is not limited to:

a.  Non-consensual digital, video or audio recording of any form of nudity or sexual activity
b.  Knowingly exposing a person to  an STI or HIV to another person
c.  Engaging in Voyeurism
d.  Non-Consensual sharing or distribution of digital, video or audio recording of nudity or sexual activity
e.  Prostituting another person by offering a person for sexual activity in exchange for payment.
f.  Invasion of sexual privacy, including exposing one's sexual body parts or exposing another's sexual body parts
g.  Child pornography as defined in federal, state or local law.

## Non-Consensual Sexual Contact or Activity

Non-Consensual Sexual Contact is contact that involves all of the following:

a.  Any intentional sexual contact or sexual activity;;
b.  with any object or body part;
c.  by a person upon another person; and
d.  without consent

Sexual Contact includes:  Intentional contact with the breast(s), buttock(s), groin or genitals, or touching another with any of these body parts; making another person touch you or themselves with any of these body parts; and/or any intentional bodily contact in a sexual manner.

Sexual Activity includes: Intentional bodily activity that is sexual in nature and involves the breast(s), buttock(s), groin or genitals, or touching another with any of these body parts; or making another person touch you or themselves with any of these body parts.

## Forced Sexual Contact or Activity

Forced Sexual Contact is contact that involves all of the following:

a.  Any intentional sexual contact or sexual activity;
b.  by force or against the will of the victim.  Force includes:  the use of physical means, violence, threats, intimidation or coercion;
c.  with any object or body part; and
d.  by a person upon another person.

Sexual Contact includes:  Intentional contact with the breast(s), buttock(s), groin, or genitals, or touching another with any of these body parts; making another person touch you or themselves with any of these body parts; and/or any intentional bodily contact in a sexual manner.

Sexual Activity includes: Intentional bodily activity that is sexual in nature and involves the breast(s), buttock(s), groin or genitals, or touching another with any of these body parts; or making another person touch you or themselves with any of these body parts.

**Non-Consensual Sexual Intercourse**

Non-Consensual Sexual Intercourse is intercourse that involves all of the following:

    a.  Any sexual intercourse (anal, oral or vaginal);

    b.  with any object or body part;

    c.  by a person upon a person; and

    d.  without consent.

**Forced Sexual Intercourse**

Forced Sexual Intercourse is intercourse that involves all of the following:

    a.  Sexual intercourse (anal, oral or vaginal);

    b.  with any object or body part;

    c.  by a person upon another person; and

    d.  by the use of force, including physical force, threat, intimidation or coercion

**Intimate Partner Violence**

Intimate Partner Violence, defined as violence or abuse between those in a close romantic, or intimate relationship to each other. Intimate Partner Violence can consist of intimidation, harassment, physical abuse, sexual abuse, or interference with personal liberty of any person by someone in an intimate relationship, as described below.

These actions may include, but not limited to:

    a.  Physical abuse: hitting, slapping, shoving, grabbing, pinching, biting, or hair pulling.

    b.  Sexual abuse: attacks on sexual parts of the body, forcing sex after physical violence, treating one in a sexually demeaning manner, coercing or attempting to coerce any sexual contact or behavior without consent.

    c.  Psychological or emotional abuse: a pattern of behavior undermining an individual's sense of self-worth or self-esteem, constant criticism, diminishing one's abilities, name-calling.

Close, romantic, or intimate partner relationship includes:

    a.  Persons who have or have had a dating relationship

    b.  Persons who have or have had a social relationship of a romantic or intimate nature

**Stalking**

Stalking can be in two different forms:

Stalking 1: A course of conduct:

    i. Directed at a specific person;

    ii. On the basis of actual or perceived membership in a protected class;

    iii. That is unwelcome; and

    iv. Would cause a reasonable person to feel fear.

Stalking 2:

       i. Repetitive and menacing behavior; or

       ii. Pursuit, following, harassing and/or interfering with the peace and/or safety of another.

## Additional Applicable Definitions

### Unwelcome Behavior

Unwelcome behavior is an action that is not solicited or invited and is undesirable or offensive to the recipient. Behavior that is perceived to be voluntary does not necessarily mean that it is welcome. Power relationships, incapacitation, intimidation and/or fear of consequences may be contributing factors in this determination.

### Consent and Incapacitation

Consent is the equal approval, given freely, willingly, and knowingly, of each participant to desired sexual involvement. Consent is an affirmative, conscious decision – indicated clearly by words or actions – to engage in mutually accepted sexual contact. A person forced to engage in sexual contact by force, threat of force, or coercion has not consented to contact.

- Lack of mutual consent is the crucial factor in any sexual misconduct matter.
- Consent to some form of sexual activity does not necessarily constitute consent to another form of sexual activity.
- Consent to past sexual activity does not imply consent to future sexual activity.
- Consent can be withdrawn at any time.
- Consent to engage in sexual activity with one person does not imply consent to engage in sexual activity with another.
- Silence without demonstrating permission does not constitute consent.
- Consent CANNOT be given if a person's ability to resist or consent is incapacitated because of a mental illness or physical condition or if there is a significant age or perceived power differential.
- Sexual activity with someone who the respondent should know to be, or based on the circumstances should reasonably have known to be, mentally or physically incapacitated (by alcohol or other drugs, unconsciousness, sleep, or blackout) is sexual activity without consent.

Incapacitation is a state in which someone cannot make rational, reasonable decisions because the person lacks the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction). Examples include, but are not limited to, being:

    a. unconscious,
    b. asleep
    c. frightened,
    d. physically or psychologically pressured or forced,
    e. intimidated,
    f. incapacitated because of a psychological or intellectual health condition or disability,
    g. incapacitated because of voluntary intoxication due to use of drugs or alcohol, or
    h. incapacitated because of the deceptive administering of any drug, intoxicant or controlled substance.

### Coercion

Coercion is unreasonable pressure for sexual activity.

### Force
Force is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and coercion that overcome resistance or produce consent.

## Relevant Considerations

### Relationships Involving Authority or Power
When one party has any professional responsibility for another's academic or job performance or professional future, the university considers sexual relationships between the two individuals to be a basic violation of professional ethics and responsibility.  This includes but is not limited to sexual relationships between faculty (including teaching assistants and laboratory supervisors) and their students or between supervisors and their employees, even if deemed to be mutually consenting relationships.  Because of the asymmetry of these relationships, "consent" may be difficult to assess, may be deemed not possible, and may be construed as coercive.  Such relationships also may have the potential to result in claims of sexual harassment.  For more information, see Consensual Relationship Policy at http://www.case.edu/finadmin/humres/policies/standards/cr.html. or http://www.case.edu/president/facsen/frames/handbook.htm.

Although sexual harassment often takes place when the alleged harasser is in a position of power or influence (e.g., a faculty advisor to a student, supervisor to supervisee), other types of sexual misconduct are also possible e.g., peer to peer.

### Intention vs. Impact
The fact that someone did not intend to engage in sexual misconduct against an individual is not considered a sufficient explanation to a complaint of sexual misconduct.  For example, in some instances, cultural differences may play a role in the interpretation of behavior, by either the complainant or respondent, which may result in a complaint of sexual misconduct.  It is expected that all members of the university community are knowledgeable about what constitutes sexual misconduct under this policy.  Although the respondent's perceptions will be considered, in most cases, it is the effect and characteristics of the behavior on the complainant, and whether a reasonable person in a similar situation would find the conduct offensive that determine whether the behavior constitutes sexual misconduct.

### Academic Freedom
Case Western Reserve University adheres to the principles and traditions of academic freedom.  As stated in the Faculty Handbook, academic freedom is a right of all members of the university faculty and applies to university activities including teaching and research.  See http://www.case.edu/president/facsen/frames/handbook.  Each faculty member may consider in his or her classes any topic relevant to the subject matter of the course as defined by the appropriate educational unit.

Case Western Reserve University also recognizes, however, that these freedoms must be in balance with the rights of others not to be sexually harassed.  It is therefore understood that the principles of academic freedom permit topics of all types, including those with sexual content, to be part of courses, lectures, and other academic pursuits. If there are questions about whether the course material or the manner in which it is presented falls within the definition of sexual harassment, the concerned party(s) should contact a Designated Reporting Representative (See: Designated Reporting Offices section in this policy).

## Reporting

The university strongly encourages persons who experience sexual misconduct to report the misconduct, to seek assistance and to pursue university action for their own protection and that of the entire campus community.

Anyone who has experienced sexual misconduct may choose to use this university process as well as a criminal process. Choosing not to pursue university or criminal action, however, does not remove the responsibility of the university to investigate and/or take action.  If pursuing a criminal process, see section on Emergency Room Examination/Preservation of Evidence, as applicable.

Reports can be submitted anytime following an incident of sexual misconduct, although the university's ability to take action may be limited by the timeliness of the report and the status of the alleged respondent. Generally, complaints should be brought to the attention of the university within two years of the alleged incident. The university reserves the right to utilize the sexual misconduct policy and procedures to take action concerning a complaint filed after this period of time.

When conducting the investigation under this policy, the university's primary focus will be on addressing the sexual misconduct.  Other policy violations discovered may be referred to another process.

### Designated Reporting and Confidential Support Resources
A person wishing to pursue university action must report the conduct to one of the three University Designated Reporting Representatives (See Chart I).  Taking this action does not prevent reporting the matter to the CWRU Police and Security. To contact the CWRU Police and Security Services, call **216-368-3333**.  A person who has experienced sexual misconduct also may seek advice and guidance from confidential support resources, as discussed below (see Chart IIa and IIb).

### Role of Designated Reporting Representatives
   a.  To hear the initial complaint/statement by the complainant and the respondent, and to make safety and support arrangements as appropriate.

   b.  To receive initial complaint(s) regarding alleged sexual misconduct and to make the complainant aware of the university obligation to take action if the respondent is identified or identifiable.

   c.  To provide the complainant and the respondent information about the policy and process, including the rights of the complainant and the respondent under this policy.

   d.  To determine if the complaint falls within the Sexual Misconduct Policy and if so, to determine appropriate next steps.

   e.  To conduct an inquiry into reports from anonymous sources. In such instances, the university may be limited in its ability to conduct an effective inquiry and to take action concerning the report

| Chart I. Designated Reporting Representatives |
| --- |
| **For Student Concerns and Third Parties: Office of Title IX** |
| Thwing 318 (216)368-3066 -- (M-Fri) 8:30 a.m. to 5:00 p.m. |
| Adelbert 110 (216)368-2020 -- (M-Fri) 8:30 a.m. to 5:00 p.m. |
| **For Faculty Concerns:** |
| **Faculty Diversity Officer** |
| **Adelbert Hall 315** |
| (216)368-8877 -- (M-Fri) 8:30 a.m. to 5:00 p.m. |
| **For Staff Concerns:** |
| **Equal Employment Opportunity & Diversity Manager** |
| **Adelbert Hall 315** |
| (216) 368-8877 -- (M-Fri) 8:30 a.m. to 5:00 p.m. |

<u>**Role of Confidential Support Resources**</u>

Confidential resources are those members of the university who are licensed or designated by law as professionals who can receive privileged communication, and receive information regarding possible sexual misconduct in the context of a professional relationship with the reporter of that information.

Confidential resources are not required to report allegations of sexual misconduct to Designated Reporting Representatives unless required by law such as the duty to report an imminent threat to self or others (see Charts IIa. and IIb.).  Confidential resources provide advice, support, and guidance about how to manage the situation without initiating university action.  Discussions with a confidential source are not considered a report to the university or a request that any action be taken by the university in response to any allegation.

| Chart IIa. Student Confidential Support Resources | |
| --- | --- |
| **On-Campus Resources** | **Off-Campus Resources** |
| **(SAFE) Line**<br>(216) 368-7777 – Anytime 24 / 7<br>For privileged and confidential conversations about sexual assault and relationship violence.<br><br>**University Health and Counseling Services**<br>Sears 201<br>(216) 368-5872 – 24 Hours<br><br>**Health Services**<br>2145 Adelbert Rd.<br>(216) 368-2450 – 24 Hours<br><br>**Student Advocate for Gender Violence Prevention, Education, and Advocacy**<br>Sears 201<br>(216) 368-8639-(M-Fri) 8:30 am - 5:00 pm<br><br>**Inter-Religious Center:**<br>Church of the Covenant<br>11205 Euclid Avenue—Annex<br>(216) 421-9614 or Hillel (216) 231-0040<br>(Ask to speak with a Clergy person) | **The Cleveland Rape Crisis Center (CRCC)**<br>(216) 619-6192 – 24 hours<br><br>**The Domestic Violence Center & Child Advocacy Center (DVCAC)**<br>(216) 391-HELP (4357) – 24 hours |

| Chart IIb. Faculty & Staff Confidential Support Resources | |
|---|---|
| **On-Campus Resources** | **Off-Campus Resources** |
| **Employee Assistance Program** (216) 241-EASE (3273) or (800) 521-3273 – 24 Hours | **The Cleveland Rape Crisis Center (CRCC)** (216) 619-6192 – 24 hours<br><br>**The Domestic Violence Center & Child Advocacy Center (DVCAC)** (216) 391-HELP (4357) – 24 hours |

## Police Resources

Anyone who has experienced sexual misconduct may choose to contact at any time either **University Police & Security Services** or a local police jurisdiction where the misconduct occurred. (See Chart III).

| Chart III. On-Campus Police Resources |
|---|
| **CWRU Police & Security Services**<br>  **1689 E. 115 Street Cleveland, Ohio 44106-7173**<br>216-368-3333 – Anytime 24/7<br>For police assistance and action related to sexual misconduct |

## Anonymous Reports

In the event that the university receives an anonymous report of sexual misconduct, the university will conduct an inquiry into the matter. In such instances, the university may be limited in its ability to conduct an effective inquiry and to take action concerning the report.

# Confidentiality & Retaliation

## Confidentiality and Privacy

Complainants have the right to request confidentiality of a complaint of sexual misconduct. The responsibility of the Designated Reporting Representative(s) is to weigh requests for confidentiality against the need to investigate and protect the university community. In reviewing a complainant's request for confidentiality, the Designated Reporting Representative will weigh the request against other factors such as the seriousness of the alleged misconduct; the risk that the respondent may commit additional acts of sexual misconduct; whether the report indicates a pattern of sexual misconduct including whether other complaints or findings of sexual misconduct or violence have been made against the respondent or at a particular location; whether the complainant is a minor; and whether the University has other means to obtain relevant evidence about the alleged sexual misconduct. The Designated Reporting Representative will advise the complainant that the request for confidentiality will limit the University's ability to investigate and to take appropriate action regarding the complaint, but that the University will attempt to limit the effects of the misconduct and prevent its recurrence (i.e. increased monitoring or appropriate training and education), while adhering to the request for confidentiality. If the Designated Reporting Representative cannot grant a complainant's request to maintain confidentiality of the complaint and/or the complainant's identity, the Designated Reporting Representative will discuss with the complainant this determination and what information will be disclosed and to whom it will be disclosed as necessary to conduct an investigation or take appropriate action.

The Designated Reporting Representative(s) will attempt to keep complaints private to the extent possible and consistent with legal requirements and/or the university's requirement to investigate allegations and take appropriate action. Information about sexual misconduct complaints and investigations will be shared with those responsible for

handling the complaint and those with a need-to-know the information to meet the University's obligations under this Policy.

In order to protect the integrity of the inquiry, investigation, and resolution through the use of this policy, all parties and witnesses are expected to maintain the confidentiality of the process. However, confidentiality is not required if disclosure is required by law, or if disclosure is necessary to report a crime or violation of law or to engage in concerted activity regarding terms or conditions of employment, or in relation to the right of a student respondent or complainant to re-disclose the outcome of the process under FERPA and/or Campus Crime Statistics Act (Clery Act) laws.

Although there is an expectation of confidentiality with regard to the process, the university recognizes that the complainant, respondent, and witnesses may need support. Should the need arise for parties and/or witnesses to seek support and/or share with others information regarding this process, they are encouraged to confer with the Designated Reporting Representatives regarding this action, including how to find an advisor or advocate.

## Retaliation

Retaliation is prohibited and will constitute separate grounds for disciplinary action. Retaliation is the act of taking adverse action against a complainant, a respondent, or any other person involved in the process under this policy based on the person's reporting or participation in the process under this policy. Retaliation includes behavior on the part of the respondent or the complainant and other related persons, including, but not limited to, acquaintances, friends, and family members. Although independent action will be taken against anyone engaging in retaliation, the complainant and the respondent are responsible for discouraging such actions and will also be held responsible to the extent of their involvement in the retaliation.

An individual who believes they have experienced retaliation should contact a Designated Reporting Representative (see Chart I) under this policy, and the university will investigate the complaint. If the university determines that evidence exists to support that retaliation occurred, appropriate action will be taken regardless of the outcome of the underlying sexual misconduct complaint. This may involve referral of the retaliation concerns to another university process for resolution.

# Responsibilities of the University Community

## Reporting Responsibility

Any university faculty, staff, official or student employee (ex. Resident Assistants and Orientation Leaders) who is consulted about and/or witnesses behavior involving potential sexual misconduct has the responsibility to report the potential misconduct to one of the Designated Reporting Representatives. Students are encouraged to report sexual misconduct when they are consulted about and/or witness behavior involving potential sexual misconduct, and may fulfill the reporting expectation by contacting a Designated Reporting Representative. In addition, to the extent possible, the member of the university community should advise the complainant of the university's sexual misconduct policy and encourage prompt reporting to a Designated Reporting Representative (see Chart I). The university community member's duty to report includes instances in which that member learns of the allegation:

    a.  From witnessing sexual misconduct
    b.  From a person who has experienced the sexual misconduct;
    c.  From a person who witnessed the sexual misconduct; or
    d.  From a person who heard about the sexual misconduct from another individual.

Reporting is required in these instances if the university community member receives information that permits the member to identify (i) the complainant or the respondent by name or by other identifying information, or (ii) the location at which the sexual misconduct occurred. The required reports should include all relevant facts about the alleged sexual misconduct incident necessary for the University to investigate, including the names of those involved, any witnesses, and other relevant details such as date, time, and specific location of the incident. Because the university is committed to a positive educational and work environment, in instances in which individuals believe that behavior has

occurred that could be construed as sexual misconduct, the individual is encouraged to report the incident to a Designated Reporting Representative.

## Cooperating with Investigations

All members of the university community are encouraged to cooperate and participate in inquiries and investigations, appear before a hearing panel as requested, and cooperate with resolutions of complaints and implementations of recommended sanctions as applicable.

## Police Responsibility

There may be instances in which sexual misconduct constitutes a criminal act.  The police have a responsibility to uphold and enforce the law even if the person experiencing the misconduct does not want to participate in the process and/or make a complaint.  As a result, once a report is made to a police officer and/or once the officer learns of possible criminal activity, the officer has a duty to investigate and may have a duty to forward information to the appropriate prosecutor's office for possible criminal prosecution.  The CWRU Police will also notify the Title IX Coordinator as appropriate.

When the person who has experienced sexual misconduct is under the age of 18, or under 21 and physically or mentally impaired, the Designated Reporting Representative may be required to report the sexual misconduct to the appropriate social service agency or the police.

## Support of Witnesses and Bystanders

The welfare and safety of our community is of paramount importance.  The university encourages community members to offer help and assistance to others in need.  Sometimes individuals are hesitant to offer assistance to others for fear that they will be subject to sanctions for other policy violations (e.g. alcohol violations).  While serious policy violations cannot be overlooked, the university will consider providing educational options or training rather than sanctions as an appropriate response to those who have offered assistance.

## University's Investigative Responsibility

The informal and formal processes as described in this Policy apply to faculty, staff, and students of the university.  (See Flow Chart in this Policy).   Once a report of sexual misconduct is made to one of the Designated Reporting Representatives, the university is obligated by law to investigate and to take appropriate action regardless of whether the complainant wishes to participate or considers the behavior sexual misconduct.

The university's authority to investigate, to compel cooperation, or to impose sanctions against those who are not members of the university community is limited.    Complaints against guest lecturers, volunteers, contractors and visitors will be referred to the Title IX Coordinator for investigation and appropriate action.

## University's Responsibility to Support A Fair Process and the Rights of the Complainant and Respondent

The university is committed to providing support to anyone involved in an incident of sexual misconduct.  The University is responsible for assuring that the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy.    The complainant and the respondent can expect the university to respect the rights of all involved by following the stated university sexual misconduct process.  The University will maintain the rights of the complainant and the respondent in implementing this Policy.  These rights of the complainant and respondent related to the process include:

   a.  To confidentiality as provided in this policy (see above).

   b.  To options outlined below in the informal process or formal process if applicable.

   c.  To the presence of an advisor (as described in this policy below) at meetings during the initial inquiry and during the Informal process and/or Administrative/Formal Hearing (see Hearing Procedures).

d.  To not be questioned or have information presented about past sexual conduct or history with anyone other than with the complainant or respondent, unless related to a pattern of prior violations or behavior by the respondent that was substantially similar to the present complaint.

e.  To have the allegations investigated in a thorough and timely manner.

f.  To refrain from making statements.  However, the university will make a determination of whether a violation of the sexual misconduct policy occurred based on the information presented.

g.  To be informed of the outcome of the sexual misconduct process in a timely manner.

h.  To access to support resources listed in this Policy.

## Notifications

### Parental/Legal Guardian/Partner Notification

In some instances when there is a health or safety concern involving a dependent or a non-dependent student, the university may need to notify the parent(s), guardian(s), or partner.  In making this determination, the university will consider the wishes of those involved, as well as their personal safety, and the safety of the campus community.  The university may contact the parent(s) or guardian(s) of a dependent student when there is a concerning behavioral pattern or a change in student status.  In addition, when a person who is under the age of 18, or under 21 and physically or mentally impaired, reports sexual misconduct other than sexual harassment, both Designated Reporting Representatives and confidential sources may be required to report the sexual misconduct to the appropriate social service agency or the police who then may contact the parent or legal guardian.

### Federal Timely Warning Obligations

Once a report of sexual misconduct is made, the university is obligated by law to take all necessary steps to protect the campus and the person who has experienced the misconduct.  This may include alerting the campus of crimes that it determines pose a substantial threat of bodily harm or danger to members of the campus community.  In making such determinations, the university will consider the safety of students, faculty, and staff as well as the privacy interests of all persons involved in such incidents.  Regardless of the action taken by the university, the university will make every effort to ensure that a victim's name and other identifying information is not disclosed, while still providing enough information for community members to take safety precautions.

### Federal Statistical Reporting Obligations

In compliance with the Clery Act (Campus Crime Statistics Act), Designated Reporting Representatives are required to report to CWRU Police sexual misconduct that constitutes a crime (i.e. anything not defined in this policy as sexual harassment).  In addition, anonymous reports and de-identified reports of crimes from confidential support resources received by the CWRU Police are also included in the Clery Act Report.   Typically, the following information is included: crime, date, location, and status (i.e. student, faculty, staff, stranger, etc.) of the individuals involved in the crime.  The university never includes the names of the complainant or the respondent in crime statistics.

When a complaint of sexual misconduct is made that may also constitute a criminal act, the Designated Reporting Representative also will inform the complainant of the right to file a criminal complaint.



## Student, Faculty & Staff
## Sexual Misconduct Complaint Process

## University Complaint Processes

The university strongly encourages persons who experience sexual misconduct to report the misconduct, to seek assistance and to pursue university action for their own protection and that of the entire campus community.

When a complaint of alleged sexual misconduct is received, an initial inquiry is conducted by a Designated Reporting Representative, who is a neutral administrator in the process. The Designated Reporting Representative is responsible for coordinating the sexual misconduct process. The usual practice will be that the inquiry will be conducted in collaboration with the Office of Inclusion, Diversity and Equal Opportunity and the University Office of Student Affairs as appropriate and possible.

### Time Table

The university intends to resolve complaints of sexual misconduct in a timely manner. The University generally attempts to resolve complaints from the filing of a complaint to a determination within sixty (60) days. The University generally attempts to make a determination on appeals within ten (10) business days following the submission of an appeal. However extenuating or more complex circumstances may preclude the university from resolving a complaint within such a timeframe. The Title IX Coordinator, or his/her designee, will make a determination as to any reasonable extension of these timeframes. Complainants and respondents will be provided periodic updates as to the status of the process.

### Initial Inquiry

An initial inquiry is conducted by the Designated Reporting Representative/ Title IX Coordinator and will generally include interviews with the complainant and the respondent and a review of relevant documents. Following the initial inquiry, the Title IX Coordinator will determine whether the information gathered during the initial inquiry indicates that the complaint falls within this policy. The complainant and respondent will be informed promptly after the completion of initial inquiry.

If it is determined that the complaint falls within this policy, the Designated Reporting Representative will either: 1) proceed with the Informal Process; or 2) refer the matter to the Sexual Misconduct Investigator/Title IX Coordinator (for a determination as to whether the process should proceed to the Informal Process, the Formal Process, or another university process. See Investigator process below.) The Title IX Coordinator will make this determination by reviewing the following factors surrounding the complaint:

  a. The wishes of the complainant and the respondent;
  b. Consideration of a pattern of behavior; and
  c. The nature and severity of the behavior or action; and
  d. The sufficiency of the information.

The complainant and the respondent will be informed promptly upon a determination by the Designated Reporting Representative/Title IX Coordinator.

### Interim University Actions

In addition to conducting an initial inquiry, the Designated Reporting Representative/Title IX Coordinator may need to take interim actions to protect the safety and well-being of the individuals involved in a complaint of sexual misconduct. The university will consider interim or remedial measures, as appropriate or legally supported, to protect those involved. These measures will be implemented as promptly as possible. Generally, such actions include, but are not limited to, the following:

  a. Notify the respondent that a complaint has been made against them;
  b. Provide a copy of the university sexual misconduct policy to both parties;
  c. Direct the parties or establish an agreement between the parties that they are not to initiate contact with the other party or parties until further notice by the university. Failure to cooperate or honor the agreement could result in restricting either party's presence on campus;

d.  Institute alternative work arrangements, living arrangements, dining facilities, class schedule, or advisor/supervisor arrangements as feasible and appropriate during the pendency of the process, considering safety issues and concerns of the complainant and the respondent;

e.  Provide access to appropriate academic supports, such as tutoring, or permission to withdraw from or retake a class or classes;

f.  Have each of the parties and any witnesses acknowledge the expectation of confidentiality as outlined in this policy;

g.  Advise all parties and any witnesses that they may not retaliate against any party or any witness involved in a sexual misconduct complaint.

h.  Notify the dean, department chair or supervisor of the complaint to assist with managing the rights of the complainant and the respondent as appropriate.

**Interim Separation/Suspension Action:**  The University has the right to impose an interim separation or suspension, as provided for under other university policies or procedures.

## Role of the Designated Reporting Representative and/or Title IX Investigator(s)

The Designated Reporting Representative/Title IX Coordinator and/or Title IX Investigator conducts a prompt and thorough investigation of the complaint, which includes identifying and interviewing witnesses, gathering and securing relevant documentation, and identifying other relevant information.  Depending on the number of ongoing investigations and/or the nature and complexity of the complaint, the Title IX Investigator for a complaint may be a qualified investigator retained by the university from outside the university community.  The Designated Reporting Representative/ Investigator provides a report of the finding of the investigation for review by the Title IX Coordinator or his/her designee in consultation with the Office of General Counsel.  A decision will be made as to the appropriate next steps to bring resolution to the complaint, which will include one of the following:

a.  Formal Process (Administrative Hearing or Board Hearing);

b.  Informal Process;

c.  Another university process;

d.  End the process.

In making this determination, the reviewers will consider the following factors:

a.  The wishes of the complainant and the respondent;

b.  Consideration of a pattern of behavior; and

c.  The nature and severity of the behavior or action.

d.  The sufficiency of the information to move forward.

If the Title IX Coordinator finds that the complaint does not fall within the sexual misconduct policy, the matter and other possible policy violations discovered (including any relevant information) may be referred to other university processes.

## Informal Process

The informal process is an opportunity to bring resolution to an informal complaint through awareness, education, and/or a facilitated discussion.  During an informal process, a hearing is not conducted to determine whether the sexual misconduct policy has been violated.  Normally, the informal process will not be used to resolve allegations of Non-Consensual Sexual Contact/Activity, Forced Sexual Contact/Activity, Non-Consensual Sexual Intercourse, Forced Sexual Intercourse and Sexual Exploitation.  The complainant will be advised of the right to end the informal process and begin the formal process, if the complainant wishes to do so.

### Step 1-Facilitate Resolution

The Designated Reporting Representative(s)/Title IX Coordinator utilizes the information gathered during the initial inquiry to facilitate an appropriate resolution to the informal complaint.  The Designated Reporting Representative(s)/Title IX Coordinator may determine that the informal action may be facilitated by an appropriate designee (e.g. for students, a Residential Coordinator or other designee; for staff, Human Resource representative;

for faculty, the Chair).  The following are examples of possible options, one or more of which may be used to bring resolution to an informal complaint.

    a.  Distribute a copy of the sexual misconduct policy to the respondent and/or the complainant and/or to the department or area whose behavior is being questioned;

    b.  Educate the respondent or all parties regarding the university sexual misconduct policy;

    c.  Conduct a sexual misconduct educational workshop for the designated department/school/university organization;

    d.  Meet with the respondent to raise awareness about alleged inappropriate behavior and provide notice about possible university consequences;

    e.  Facilitated discussion with the agreement of the complainant, respondent, and the Title IX Coordinator/Designated Reporting Representative(s) or designee;

    f.  Institute alternative work arrangements, living arrangements, class schedule, dining facilities, or advisor/supervisor arrangements as feasible;

    g.  Provide access to appropriate academic supports, such as tutoring, or permission to withdraw from or retake a class or classes; and/or

    h.  Limit contact or impose no contact between respondent and complainant.

**Step 2-Document Informal Resolution**

At the conclusion of the informal process, a letter summarizing the outcome(s) of the process will be sent by the Designated Reporting Representative(s)/Title IX Coordinator to the complainant and respondent and other appropriate university officials to bring closure to the matter (see Retention of Documents section in this policy).

If the matter is not resolved to the satisfaction of the complainant or the respondent utilizing the informal process, and/or the university determines the matter should be resolved through the formal process, the complainant, the respondent and/or the university may pursue the formal process.  In such an instance, the complainant, the respondent and/or the university may request to utilize the formal process by submitting a written request to the Designated Reporting Representative/Title IX Coordinator within five (5) business days of the date of the receipt of the informal outcome letter.

## Formal Process
### Determination of Administrative Hearing vs. Board Hearing:

A formal process may be facilitated in one of two ways, through an administrative hearing or a board hearing.

An administrative hearing may be used when a, b(i) or b(ii), and c all exist:

    a.  The complainant wishes to use an administrative hearing to resolve the complaint;

    b.  (i) The respondent has admitted to the alleged sexual misconduct and admits that the conduct is or could be construed as sexual misconduct under the university's policy, or
        (ii) For matters in which the complainant and the respondent are both students, the Designated Reporting Representative/Investigator has determined, after consultation with the Title IX Coordinator or his/her designee and the Office of General Counsel, that an administrative hearing is appropriate to determine both whether a violation of the Policy has occurred and an appropriate sanction for a violation of the Policy, if any.  In such cases, the Title IX Coordinator will determine that the administrative hearing shall be conducted, as appropriate, by either (a) a representative from the Office of Student Affairs, or (b)  three (3) members of the Sexual Misconduct Panel, selected as provided for in the Formal Process: Sexual Misconduct Panel section, below.

    c.  The investigation or review determine(s) that an administrative hearing is appropriate to bring resolution to the complaint.

A board hearing is used when the following exists:
   a.  The complainant wants to use a board hearing to resolve the complaint, and/or the review of the investigation determines that a board hearing is necessary to resolve the complaint.

   b.  The respondent does not admit that the alleged sexual misconduct has occurred and/or does not admit that the alleged conduct is or could be construed as sexual misconduct under this policy, or the Designated Reporting Representative/Investigator determines, after consultation with the Title IX Coordinator or his/her designee and the Office of General Counsel, that use of a board hearing is appropriate.

To move the formal process forward, the Title IX Investigator/ Title IX Coordinator will submit the following documents to the Sexual Misconduct Panel or administrative hearing representative(s) for their consideration at a formal hearing:

   1.  The written account from the complainant of the sexual misconduct complaint.  When possible, the account should include dates, times, locations, a description of the alleged behavior/incident, and the name(s) of the respondent.

   2.  The written account from the respondent of the sexual misconduct complaint.  When possible, the account should include dates, times, locations, a description of the alleged behavior/incident.

   3.  Additional written accounts from witnesses collected during the investigation.

   4.  Other relevant documents collected during the investigation, including the report of the Title IX Investigator/Deputy Title IX Coordinator.

   5.  In addition, the complainant and the respondent may submit their own written statement about the facts of the alleged behavior/incident for consideration by the panel.  Written statements must be submitted no later than three (3) business days prior to the scheduled hearing.

   6.  The complainant and the respondent may also submit their own written statement about the impact of the alleged behavior/incident for consideration by the panel during the sanction phase of the process, if applicable.  Written statements must be submitted no later than three (3) business days prior to the scheduled hearing.

   7.  The complainant and respondent may provide a list of any person(s) who may have <u>relevant</u> information about the behavior/incident.

   8.  Once 1-7 have been completed, the case will be turned over to the chairperson of the Sexual Misconduct Panel or the administrative hearing representative who will contact the complainant and respondent within five (5) business days to schedule a pre-hearing meeting and/or a hearing.

## University Role to Address Violations of Policy Via Formal Process

The university may address violations of the policy in instances in which the complainant is not willing to bring a complaint and the university determines it is necessary to proceed with a formal process under the policy.  In such a case, the university will select a representative to act during the formal process.

Generally, if the respondent is a faculty member, the university representative shall be the Provost or his/her designee; if the respondent is a student, the university representative shall be the Vice President for Student Affairs or his/her designee; and if the respondent is a staff member, the university representative shall be the Vice President for Human Resources or his/her designee.  If the university representative is the respondent or a potential witness, the Title IX Coordinator shall appoint the university representative.  The university representative shall have the same rights and responsibilities as the complainant as outlined in this policy.  The university representative shall not be an attorney from the Office of General Counsel.

**Formal Process: Administrative Hearing**

The function of this hearing is to review the relevant documents, hear from the respondent and the complainant where complainant wishes to participate, and to determine whether the Sexual Misconduct Policy has been violated in cases in which the complainant and respondent are both students, and/or an appropriate sanction.

All administrative hearings will be conducted by (1) a representative of the Office of Inclusion, Diversity or Equal Opportunity, or the Office of Student Affairs, or his or her designee ("the administrative hearing representative"), as appropriate, or (2) three members of the Sexual Misconduct Panel, as provided for in provision b.ii above.

*Administrative Hearing Procedure*

1. The complainant and respondent will be notified of the date, time and location of the hearing.

2. The hearing is closed and generally includes the respondent, the Title IX Investigator/ Title IX Coordinator who conducted the investigation, and the administrative hearing representative(s).  The complainant will be notified of the option to attend the hearing if the complainant wishes to do so.

3. The complainant may submit an additional written statement concerning the effect of the sexual misconduct and the desired sanction for the respondent.  The written statement must be submitted no later than three (3) business days prior to the scheduled hearing.

4. The respondent may make a statement about the sexual misconduct and the possible sanction(s) for the misconduct.  The written statement must be submitted no later than three (3) business days prior to the scheduled hearing.

5. The administrative hearing representative(s) may ask questions of the respondent and will consider the statements and any relevant information received during the investigation.

6. Prior to determining whether the Sexual Misconduct Policy was violated and/or a sanction, as applicable to the matter, the administrative hearing representative(s) will normally consult with the following individuals depending on the constituency of the respondent:
   When a student is the respondent:  Vice President for Student Affairs or his/her designee;
   When a faculty member is the respondent:  Provost or his/her designee;
   When a staff member is the respondent:  Vice President for Human Resources or his/her designee.

After the hearing is concluded, the administrative hearing representative(s) will make a decision promptly whether the Sexual Misconduct Policy was violated , as applicable to the matter, and/or on the appropriate sanction and communicate that decision in writing to the respondent, complainant, and to any university administrators, faculty or staff who require the information to carry out the sanction.  Generally, notification will be provided to the parties within two (2) business days after the administrative hearing is held, except when extenuating circumstances preclude notification to the parties within such a timeframe.

**Administrative Hearing Appeal Process**

If the complainant or the respondent is not satisfied with the outcome of the administrative hearing, either party may notify the appropriate Designated Reporting Representative/Title IX Coordinator of the desire to file an appeal with the Appeals Board.  Appeals must be submitted within three (3) business days of receipt of the written decision.  An appeal as outlined below will then be held.

**Formal Process: Sexual Misconduct Panel**

The Office of Title IX selects and trains a Sexual Misconduct Panel that includes representation from all constituent groups within the university community (students, faculty, staff) and that is charged to hear and make a determination about whether the sexual misconduct policy has been violated and if so, the appropriate sanction for the violation.

All formal complaints referred to the Sexual Misconduct Panel in which the complainant and the respondent are both students will be chaired by the Associate Dean of Students, or designee appointed by the Associate Vice President for Student Affairs/Title IX Coordinator. For all other complaints involving different constituencies within the university (students, faculty or staff), a representative of the Office of Inclusion, Diversity and Equal Opportunity or the Office of Title IX will chair the hearing.

When a complaint is referred to the formal board process, the designated chairperson will select three representative members from the Sexual Misconduct Panel at-large (faculty, staff and/or students) to serve as the hearing panel for an individual case. The hearing panel will be comprised of three voting members and a non-voting chairperson.

In addition, an alternate member(s) may also be selected to attend the hearing in the event one of the other three voting members is unable to continue, or as training.

**Pre-Hearing Procedure:**

Prior to the board hearing, the chairperson will:

1. Determine available and appropriate hearing panel members from the Sexual Misconduct Panel. Generally, the hearing panel will include panel members representing the constituencies of the complainant and the respondent, except that the chairperson may determine that based on the nature and/or complexity of a case, student representation on the hearing panel is not appropriate. During certain times of the academic year (e.g. during break periods, final exam times etc.), the panel may not include student representation;

2. Consult with the complainant, the respondent and potential panel members to determine any personal and/or professional conflicts of interest that may make the panel member unable to render an unbiased decision. All panel participants are required to disclose any personal and/or professional conflicts of interest to the chairperson prior to agreeing to participate in a board hearing. The chairperson will determine whether a member should not serve on the panel because of a conflict of interest;

3. Advise the complainant and respondent of their right to have an advisor of their choice at the hearing, whose function is to provide support and advice for the complainant or the respondent. During the hearing, the advisor may talk quietly with the complainant or the respondent or pass notes in a non-disruptive manner. The advisor may not, in any way, intervene in the hearing or address the panel.

   An advisor may be a current member of the university community (i.e. student, full-time faculty or full-time staff member) or may be an individual from outside the university community or from an off-campus resource (e.g. Rape Crisis Center). An advisor may not be an attorney from the Office of General Counsel, a witness in the matter, or an individual that otherwise has a conflict of interest in serving as an advisor as determined by the chairperson. An advisor from within or from outside the university community may be an attorney by training, but is only permitted to act as an advisor (as described above) during the hearing. The chair will assist in advising the complainant and respondent on how to obtain an advisor;

4. Notify all panel members, the complainant, the respondent, the witnesses and all those involved in the hearing process that the hearing is closed and confidential and should not be discussed outside the hearing proceedings, except as provided in the Confidentiality section of this policy;

5. Provide the panel members access to the information to be considered by the panel. The information shall include the file compiled by the Title IX Investigator/ Title IX Coordinator, which shall include the items compiled by the Title IX Investigator/ Title IX Coordinator (see listing above), as well as:
   a. Any other information submitted by the complainant or respondent as deemed relevant to the complaint. The chairperson, in consultation with the Title IX Investigator/ Title IX Coordinator, will make determinations as to the relevance of information submitted ;
   b. Any other information that may be relevant to the complaint;
   c. Witness list and witness accounts/statements. The Title IX Investigator/ Title IX Coordinator will confer with both the complainant and the respondent regarding which of their identified witnesses will be included in the hearing. The chairperson, in consultation with the Title IX Investigator/ Title IX Coordinator, will make the final determination as to which witnesses have relevant information.

6. Provide complainant, respondent, and advisors an opportunity to review all information prior to the hearing;

7. Arrange a hearing date, time, and location and notify all hearing participants;

8. Advise panel members about the complaint and the hearing procedures.

**Hearing Procedure**
1. The chairperson will convene the hearing by introducing the participants and explaining the sexual misconduct hearing purpose, procedures and Standard of Proof. Standard of Proof is the preponderance of evidence, which means that the panel must be convinced, in light of all the information presented, that it is more likely than not that the sexual misconduct policy was violated.

2. An audio recording of the hearing will be made by the university only.

3. The chairperson may determine that a complainant and/or the respondent may participate by telephone or video conference.

4. The complainant will be invited to make a statement to the panel.

5. The respondent will be invited to make a statement to the panel.

6. Panel members will be permitted to ask questions at the conclusion of each statement. The complainant and the respondent may then ask questions of each other by submitting written questions to the chair.

7. Witnesses are invited to make a statement before the panel. The panel members, the complainant and the respondent are invited to ask questions of each witness.

8. The complainant, the respondent and their advisors will be permitted to sit in the hearing during all statements and questioning. Witnesses will be permitted to attend only during their own statements and questioning. The Investigator/ Title IX Coordinator who investigated the matter shall be present at the hearing to answer questions from the panel.

9. The panel may ask further questions of the complainant and the respondent after it has heard from all witnesses.

10. After all statements and questioning are completed, the panel will dismiss the complainant, the respondent and their advisors from the hearing and meet to discuss the finding.

11. The panel will consider all information received as part of the hearing process. The panel will issue one of the following findings, based on a preponderance of the evidence:
    a. The University Sexual Misconduct Policy was not violated or;
    b. The University Sexual Misconduct Policy was violated.

22

In addition, the panel may determine that the respondent's actions may violate some other university policy. The chairperson will refer the matter and all relevant information to the appropriate university process.

12. If the panel determines that the sexual misconduct policy was violated, the panel members will determine sanctions. Sanctions will be based on the nature and severity of the offense and/or on prior violations of university policy. The panel may consider the statements of the complainant and respondent regarding the impact of the behavior/incident during the sanction process. In general, sanctions may include, but are not limited to, one or more of the following:
   a. Apology;
   b. Participation in educational, skills or management training;
   c. Written warning, or letter of reprimand;
   d. Institute alternative work and/or living arrangements, class schedules, advisor/supervisor arrangements;
   e. Limit contact between respondent and complainant;
   f. Limit contact between the respondent and other members of the university community
   g. Faculty and staff may face suspension without pay, consideration of or denial of advancement or pay raise, demotion, removal or suspension from administrative or honorary duties or appointments, or termination for cause;
   h. Students may be suspended from the university, university housing, selected activities or organizations; placed on probation; or expelled from the university.

13. Prior to determining a sanction, the panel will normally consult with the following individuals depending on the constituency of the respondent:
   When a student is the respondent: Vice President for Student Affairs or his/her designee
   When a faculty member is the respondent: Provost or his/her designee
   When a staff member is the respondent: Vice President for Human Resources or his/her designee

## Report of Findings
1. The chairperson, in consultation with the panel, will draft a written letter that includes the panel's finding that:
   a. The Sexual Misconduct Policy has been violated and the type of sexual misconduct violated as defined in this policy, or
   b. The University Sexual Misconduct Policy has not been violated.

2. The letter will also include the reason for the finding, and sanctions (if applicable).

3. The chairperson, or his/her designee, will distribute, at the same time or as near the same time as feasible, a copy of the letter to the complainant and the respondent. The chairperson, or his/her designee, will also distribute a copy of the letter to the respondent's department chair, dean/supervisor, and appropriate vice president(s) or his/her designee. A copy of the report will be kept on file in the Office of Title IX. A student complainant or respondent has the right to re-disclose the outcome of the formal process under FERPA and/or Campus Crime Statistics Act (Clery Act) laws, as provided in the Confidentiality provision in this policy.

4. The chairperson, or his/her designee, will identify and notify the appropriate individuals to carry out the respondent's sanctions, if applicable.

5. The chairperson, or his/her designee, will notify the complainant and respondent of the right to appeal the determination and/or sanction, as provided in the Appeal Process below.

6. Sanctions are imposed immediately unless the chairperson stays their implementation in extraordinary circumstances, pending the outcome of the appeal.

Electronically Filed 12/21/2018 08:58 / / CV 18 908696 / Confirmation Nbr. 1581739 / CLDLJ

**Appeal Process**

Either the respondent or the complainant may appeal the panel's decision and/or the sanction to an Appeals Board. The Appeals Board shall consist of three (3) members of the Sexual Misconduct Panel, selected by the Associate Vice President for Student Affairs/ Title IX Coordinator, or his/her designee who has not been involved in the particular matter, being appealed. The members of the Appeals Board shall not have served as a member of the hearing panel. The Appeals Board shall not rehear or make a redetermination of the facts of the matter, but will review only whether the decision erred in one of three limited grounds on which an appeal may be filed, which are as follows:

1. New information not available to the panel which, if available at the time of the hearing, would have significantly affected the decision;

2. Evidence that established procedures were not followed in a manner that would have significantly affected the decision, and/or;

3. The sanction(s) are substantially disproportionate to the severity of the violation.

Appeals must be submitted to the Title IX Coordinator within three (3) business days of receipt of the written decision and must specify the grounds for the appeal. The Title IX Coordinator or his/her designee shall determine whether the appeal submitted falls within one of the three grounds for appeal of a decision. The appeal statement shall be provided to the other party. The other party shall be entitled to file an opposing statement responding to the appeal within three (3) business days of receipt of the appeal statement. In addition, the chairperson of the panel shall be entitled to submit a responsive statement as well.

In reviewing the appeal, the Appeals Board shall review the panel's report and sanctions to be imposed, and may review any documents or statements presented to the panel. The Appeals Board shall also review the appeals statement and any opposing and/or responsive statements. The Associate Vice President for Student Affairs/Title IX Coordinator, or his/her designee who has not been involved in the particular matter being appealed, will serve as a non-voting facilitator for the Appeals Board to advise on procedural issues involving the appeal. Prior to issuing a decision, the Appeals Board also shall confer with the appropriate Vice President(s) or his/her designee for the constituencies of the complainant or the respondent.

Generally, if an Appeals Board finds that an appeal is valid in that either appeal basis #1 (substantial new evidence was not available to the panel that would have affected the decision) or #2 (evidence that established procedures were not followed in a manner that would have affected the decision), the Appeals Board will refer the appeal back to the Sexual Misconduct Panel to rehear the matter and remedy the issue. As for appeal basis #3 (the sanction was substantially disproportionate to the severity of the violation), the Appeals Board will make the final decision regarding the finding and the sanction based on a review of the existing written record. The sanction imposed by the Appeals Board may be different than the sanction imposed by the Sexual Misconduct Panel, including a sanction that is greater than or lesser than the sanction imposed by the panel. The Title IX Coordinator or his/her designee will communicate the decision, in writing, to the respondent, the complainant, the panel members and to the appropriate administrators (i.e. respondent's department chair, dean/supervisor, and appropriate vice president). The University generally attempts to make a determination on appeals within ten (10) business days following the submission of an appeal.

The Appeals Board's decision shall be final with the exception of certain faculty sanctions described in "Additional Faculty Sanction Process."

## Additional Faculty Sanction Process

If the sanction issued to a faculty member, following any appeals, is (1) termination of a tenured faculty member's appointment or (2) demotion in academic rank of a faculty appointment (professor, associate professor, assistant professor, or instructor), then the procedures in Section IV of the Faculty Handbook are initiated. The factual findings

and conclusions of the Sexual Misconduct Panel and/or the Appeals Board shall be determinative as to whether the university's sexual misconduct policy has been violated. The Section IV of the Faculty Handbook proceedings shall be limited to a determination of whether the finding constitutes just cause for termination of the tenured faculty appointment or for demotion in academic rank.

## False Allegations

No complaint will be considered "false" solely because it cannot be corroborated. The university will take appropriate action to address and/or impose appropriate discipline on members of the university community who file documented false complaints of sexual misconduct. In such cases of proven false allegations, discipline may include, but is not limited to, suspension or termination.

## Support Resources

The following resources and options are available for individuals reporting sexual misconduct. Similarly, the university recognizes that a person being accused of a sexual misconduct may also utilize the following resources and options as appropriate and applicable.

### Alternative Housing & Academic Accommodations
The university will accommodate requests for alternative living, working, dining, and academic arrangements as available and appropriate. This is available with all reporting options in both informal and formal choices of action. The university reserves the right, based on the circumstances, to determine the most appropriate course of action in making alternative housing arrangements.

### Emergency Room Examination/ Preservation of Evidence
Any person who is a victim of physical sexual violence is urged go directly to the Emergency Room at any local hospital for medical attention. For a list of hospitals close to campus, including those with a SANE (Sexual Assault Nurse Examiner) Unit or staff specially trained for sexual misconduct examination and evidence collection, refer to the appropriate Confidential Support Resource charts in this policy or go to the university's Sexual Misconduct and Title IX website at http://www.case.edu/title-ix/ for more information.

It is important to note that the preservation of physical evidence is critical in the event of criminal prosecution and may also be useful if university action is pursued. To obtain the best evidence, a person who has experienced sexual violence should not wash her/his hands; shower or douche; brush her/his hair or teeth; or change her/his clothes immediately following the incident. If a victim goes to the hospital, local police will be called, and if the name of the accused is provided, the police will investigate, but the victim is not obligated to talk to the police or to pursue prosecution. Having the evidence collected in this manner will help to keep all options available to a victim, but will not obligate him or her to pursue any course of action.

### University Health and Counseling Services
Students can seek treatment or advice at the University Health Service for any medical concerns, including a physical exam, sexually transmitted infections, pregnancy testing, and to obtain emergency contraception. All medical information and services are privileged and confidential. There is a nurse and physician on-call 24 hours a day, 7 days a week at **216-368-2450**.

If a student decides to file criminal charges, the student must sign a *University Health Service Medical Information Release Form* if the student wishes to allow the police, the university or their representative to gain access to medical information applicable to the sexual violence.

Counseling may be pursued following an incident of sexual misconduct, no matter how much time has elapsed since the incident. The university offers a 24-hour telephone hotline for privileged and confidential conversations about sexual assault and relationship violence **(216-368-7777)**.  By calling this number, students may choose to be connected with on and off-campus resources.

On-campus counseling services are available for students at University Counseling Service in Sears, University Health Service, and the Women's Health Advocate at the Flora Stone Mather Center for Women.  There is no charge to students and the services are privileged communications. Counseling services are also available for faculty and staff through the Employee Assistance Program (EASE).  See Support Resource Charts IIa. or IIb.

## Retention of Documents

All records will be retained for at least as long as the respondent and/or the complainant(s) are members of the university community.

For undergraduate, graduate and professional students found responsible for violating the Sexual Misconduct Policy, violations will lead to disciplinary record being created and retained as follows:

- Any disciplinary violation that leads to sanctions less severe than disciplinary probation (including undergraduate, graduate and professional programs) will be retained only to be factored into any subsequent disciplinary violations. Such violations will be considered non-reportable to other higher education institutions or agencies seeking information about student disciplinary records.

- Any disciplinary violation that leads to disciplinary probation or university separation will be retained for eight years from the date of the incident or from the date of completion of all studies at the university (including undergraduate, graduate and professional programs); whichever is later, and is reportable to higher education institutions or agencies seeking information about student disciplinary records.

- Any disciplinary policy violation that leads to a sanction of university expulsion will be retained with the university permanently and is reportable to other higher education institutions or agencies seeking information about student disciplinary records.

- In cases where a student is alleged to have violated a policy but found not responsible, a record will be retained but will be considered non-reportable to other higher education institutions or agencies seeking information about student disciplinary records.

For faculty and staff, records will be kept for at least six (6) years after the matter is closed and after the individuals are no longer members of the University community.  Records will be kept in a confidential and secure location and only made available to the Title IX Coordinator, Designated Reporting Representative(s), other appropriate university officials, or other authorized individuals as determined by law.  In determining when it is appropriate to make available records regarding informal and formal complaints, the following provisions will apply:

**Informal Complaints**
Information about all informal complaints will be kept on file in the Office of Title IX, and in a confidential file in the appropriate dean's and/or department chair's and/or supervisor's office when such dean/chair/supervisor is notified of the informal complaint to ensure that the university is maintaining records of those individuals about whom multiple informal complaints have been made and/or to enforce the informal resolution. Information concerning informal sexual misconduct complaints will not be considered in processes concerning future university misconduct unless the matter involves an allegation of sexual misconduct.

**Formal Complaints**

If the respondent is found to have violated the sexual misconduct policy, a copy of the decision letter will be retained in the individual's official university file.  If a future complaint of sexual misconduct is referred to a formal process, information regarding the previous sexual misconduct complaint(s) may be considered by the panel.

In the event that the respondent is involved in and found responsible for other university violations unrelated to sexual misconduct, information about formal sexual misconduct violations and sanctions will be shared with the board during the sanctioning phase.

If the person found in violation is a:

Faculty:  The information with be kept on file in the Office of the Provost, the office of the appropriate dean and department, and the Office of Title IX.

Staff: The information with be kept on file in Human Resources, the appropriate dean and/or department, and the Office of Title IX.

Student: The information will be kept on file in the University Office of Student Affairs/ Student Conduct, the Dean's Office of the appropriate school, if applicable, and the Office of Title IX.

If the respondent is found not to have violated the sexual misconduct policy, a copy of the decision will be retained in the Office of Title IX.

## Annual Report

An annual report of sexual misconduct complaints and their resolutions shall be produced by the Title IX Coordinator or his/her designee and accessible on the Office of Title IX website. The report shall identify complainants and respondent by constituency only, e.g., student, staff, faculty.

## Prevention, Education & Training

The University is committed to engaging in efforts to prevent sexual misconduct at CWRU by education and training of its university community members on sexual misconduct reporting and prevention.   Various University offices, including but not limited to the Office of Title IX, Office for Inclusion, Diversity and Equal Opportunity, the Sexual Misconduct Prevention and Education Committee, and the Office of Student Affairs, conduct and/or oversee sexual misconduct training and education for university community members.  In addition, the Title IX Coordinator, Designated Reporting Representatives, Title IX Investigators, and Sexual Misconduct Panel members receive training on sexual misconduct and on the University Sexual Misconduct Policy.  These administrators also are involved in professional development activities and national organizations regarding sexual misconduct awareness and prevention.

# Appendix A

**Designated Reporting Representative/Investigators:**

Darnell T. Parker
Associate Vice President Student Affairs
University Title IX Coordinator
Adelbert Hall 110
10900 Euclid Avenue
Cleveland, Ohio  44106
216-368-2020

Christopher Jones
Assistant Vice President for OIDEO
Deputy Title IX Coordinator for Faculty and Staff
Adelbert 109
10900 Euclid Avenue
Cleveland, Ohio 44106
216-368-8877

Gia Adeen
Assistant Director, E.E.O. & Diversity Manager
Adelbert Hall 109
10900 Euclid Avenue
Cleveland, Ohio 44106
216-368-5371

George O'Connell
Director of Student Conduct/Community Standards
Thwing 305
10900 Euclid Avenue.
Cleveland, Ohio 44106
216-368-3170

Donna Davis Reddix
Faculty Diversity Officer
Adelbert 109
10900 Euclid Avenue
Cleveland, Ohio 44106
216-368-4299

Kimberly Scott
Assistant Dean of Students
Thwing 318
10900 Euclid Avenue
Cleveland, Ohio 44106
216-368-1936

G. Dean Patterson
Associate Vice President for Student Affairs
Adelbert Hall 110
10900 Euclid Avenue.
Cleveland, Ohio 44106
216-368-1527

Ali Martin Scoufield
Title IX Investigator
Thwing 318
10900 Euclid Avenue
Cleveland, Ohio 44106
216-368- 4047

Megan Carney
Assistant Director, Conduct/Community Standards
Thwing 305
10900 Euclid Avenue
Cleveland, Ohio 44106
216-368-3170

Daniel Nemeth Neumann
Title IX Investigator
Thwing 318
10900 Euclid Avenue.
Cleveland, Ohio 44106
216-368-8740

Anthony Polito
Assistant Director, Conduct/Community Standards
Thwing 305
10900 Euclid Avenue
Cleveland, OH 44106
2016-368-3170

**Position Descriptions:**
**Title IX Coordinator**
The Title IX Coordinator is responsible for monitoring and oversight and overall implementation of Title IX Compliance at the University, including coordination of training, education communications and administration of grievance procedures for faculty, staff, students and other members of the university community.

**Deputy Title IX Coordinator for Faculty and Staff**

The Deputy Title IX Coordinator is responsible for overseeing the resolution of issues regarding gender-based discrimination and sexual misconduct for faculty and staff in collaboration with the Title IX Coordinator. The Deputy Coordinator will also assist the Title IX Coordinator in development of training and education for faculty and staff in the university community.

**Designated Reporting Representative**
The Designated Reporting Representative is responsible for coordinating the initial inquiry, which may include interviews with the complainant and the respondent and a review of relevant documents under the supervision of the Title IX Coordinator. Following the initial inquiry, the Title IX Coordinator will determine whether the information gathered during the initial inquiry indicates that the complaint falls within this policy and will utilize criteria outlined in this policy to determine what process will be used to bring resolution to the sexual misconduct case.

**Title IX Investigator**
The Title IX Investigator serves as the investigator for sexual misconduct matters and conducts a prompt and thorough investigation of alleged sexual misconduct complaints, which includes identifying and interviewing witnesses, gathering and securing relevant documentation, and identifying other relevant information.   Depending on the number of ongoing investigations and/or the nature and complexity of the complaint, the Title IX Investigator for a complaint may be a qualified investigator retained by the university from outside the university community.

**Other Sources for Information:**
Office for Civil Rights
The U.S. Department of Education
600 Superior Ave. East Suite 750
Cleveland, Ohio 44114-2611
216-522-4970
Fax: 216-522-2573
OCR.Cleveland@ed.gov

Office of Title IX

<u>10900 Euclid Avenue</u>
<u>Cleveland, OH 44106</u>-1715

Visitors and Deliveries
318 Thwing Center

Phone 216.368.3066
Fax 216.368.8977
<u>titleix@case.edu</u>

December 03, 2018

Dear        ,

My name is Ali Martin Scoufield and I am an Investigator in the Office of Title IX. Our office is reviewing a report of behavior which may fall under the CWRU Sexual Misconduct Policy.  According to the information my office has received thus far; you reportedly engaged in non-consensual touching and non-consensual intercourse.

I need to meet with you to discuss the report. It is our intention to address and resolve this matter as quickly and thoroughly as possible for all individuals concerned. Accordingly, please contact my office at 216.368.4047 or via email at <u>ali.scoufield@case.edu</u> as soon as possible to schedule a meeting. The meeting will include you, myself, and another Title IX Investigator, Daniel Nemeth-Neumann. I have provided our availability for this week below:

Tuesday (12/4) 9:00am - 11:00am

Wednesday (12/5): 8:30am - 10:00am, 1:00pm - 2:00pm

Thursday (12/6): 8:30am - 12:00pm

The scheduled time is your opportunity to respond to the allegations, provide names of witnesses, ask questions regarding the process, and assist me in completing a timely and thorough review. At this meeting, we will review our policy and process and look to schedule another time for you to respond to the report. You may bring an advisor to this meeting if you wish, although the advisor may not speak for you or on your behalf. If you need assistance in finding an advisor, please let me know. We have trained Title IX Process Advisors who are available to support you.

For further information on our inquiry, investigation and resolution process, please visit: <u>http://students.case.edu/policy/sexual/</u>. Please let me know if you have any questions or concerns.

Sincerely,

AliMartinScoufield
Office of Title IX



**EXHIBIT**

2

Office of Title IX

10900 Euclid Avenue
Cleveland, OH 44106-1715

Visitors and Deliveries
318 Thwing Center

Phone 216.368.3066
Fax 216.368.8977
titleix@case.edu

PERSONAL AND CONFIDENTIAL

December 11, 2018

Dear          ,

The Office of Title IX received a report from Case Western Reserve University student      that may violate the university's Sexual Misconduct Policy. The Office of Title IX is currently in the process of investigating in the complaint. This letter is to serve as official notice that you are to have no contact with         for   the duration of this investigation and until further notice.

"Contact" includes, but is not limited to: verbal, written, and electronic communication, either in person or through a third party.  Please do not initiate contact or respond to any communication from the individual mentioned above.  If you are contacted by the individual mentioned above, please report it to my office at Case Western Reserve University.      will be advised that she is not to contact you as well.

Please be aware that Case Western Reserve University has a no retaliation policy. Retaliation is prohibited and will constitute separate grounds for disciplinary action. Retaliation includes behavior on the part of the respondent or the complainant and other related persons including, but not limited to, acquaintances, friends, and family members. The complainant and respondent are responsible for discouraging such actions and will also be held accountable to the extent of their involvement in the retaliation.

If you have any questions, you can contact me at 216.368.3066.

Sincerely,

Ali Martin Scoufield

Office of Title IX



EXHIBIT
3

Office of Title IX

10900 Euclid Avenue
Cleveland, OH 44106-1715

Visitors and Deliveries
318 Thwing Center

Phone 216.368.3066
Fax 216.368.8977
titleix@case.edu

**NOTICE OF INVESTIGATION**

December 11, 2018

Dear     ,

Thank you for speaking with Ali Martin Scoufield by email. This letter is a follow up to the email Ms. Scoufield sent you regarding scheduling a meeting to discuss a report submitted to our office. The report alleges your involvement in reported sexual misconduct against Case Western Reserve student     .  The alleged behaviors reported are the following:

**Non-Consensual Sexual Intercourse:** On the morning of October 21, 2018, in   residence hall room, it is alleged that you performed oral sex on   without her consent.

**Non-Consensual Sexual Intercourse:** On the morning of October 21, 2018, in   residence hall room, it is alleged that you engaged in intercourse with      without her consent.

Due to the nature of this complaint and the guidelines set forth by Title IX of the Educational Act Amendments of 1972, the complaint has been referred to my office for investigation to determine if University policy has been violated. My office has assigned Diane Citrino and her team from Giffen & Kaminski, LLC, to investigate the allegations. Citrino will conduct a full investigation into the complaint. Citrino will contact you to arrange an interview. You may bring a support person with you to the interview. Once the investigation is completed, a report will be shared with you. The report will then be reviewed to determine if the complaint will go forward for a hearing. I have attached the Sexual Misconduct Policy and Role of the Advisor to this letter for review. No decision on the allegations has been made at this time.

As a reminder the following interim measures are in effect:

**No Contact Directive:** You are not to have contact with . "Contact" includes, but is not limited to: verbal, written, and electronic communication, either in person or through a third party. Please do not initiate contact or respond to any communication from the individuals mentioned above. If you are contacted by the individual mentioned above, please report it to my office at Case Western Reserve University. Failure to comply may result in disciplinary review.

Please be aware that the Sexual Misconduct Policy prohibits retaliation against those who make complaints and/or those who are accused of acts of sexual misconduct. Please also know that University Health and Counseling Services are available for support. If you need any support measures, please let the investigators know.

**EXHIBIT**
4

Sincerely,

DarnellT.Parker


AssociateVicePresidentforStudentAffairs
University Title IX Coordinator

cc:Diane Citrino, Investigator
Brian Murray, Advisor of Choice

## Think Practical Results.



**Diane E. Citrino**
dcitrino@thinkgk.com

**Professional Associations
and Affiliations**
- Chair, Ohio Advisory Committee to the U.S. Civil Rights Commission
- The Eighth District Judicial Conference, Life Member
- Cleveland Metropolitan Bar Association, Trustee, 2006-2011
- Federal Bar Association
- American Bar Association, Delegate
- Ohio Women's Bar Association
- Workplace Investigation Group (WIG)

**GIFFEN & KAMINSKI**

Attorneys at Law

Suite 1600
1300 East Ninth Street
Cleveland, Ohio 44114
216.621.5161 ph
216.621.2399 fx

NAMWOLF

LexisNexis
Martindale-Hubbell
Peer Review Rated

Certified
WBENC

**Practice Areas**
- Litigation
- Workplace investigations
- Employment litigation and counseling
- Fair housing enforcement

**Education**
- University of California, Berkeley, CA
  Boalt Hall School of Law, Juris Doctor, 1982
- Brown University, Providence, RI, Bachelor of Arts, 1979
  Phi Beta Kappa

**Admitted to Practice**
- Licensed to practice in Illinois and Ohio
- United States Supreme Court
- United States Court of Appeals, 6th Circuit
- U.S. District Court for the Northern District of Ohio
- U.S. District Court for the Southern District of Ohio
- U.S. District Court for the Northern District of Illinois

**Professional Achievements**
- Featured in Best Lawyers Magazine for pro bono work with the Legal Aid Society, December 2016
- Featured as "Attorney of the Month" in Attorney at Law Magazine, 2015
- Martindale-Hubbell® AV Preeminent®
- Included in The Best Lawyers in America
- Friend of Fair Housing award from Fair Housing Contact Service, 2014
- Housing Research & Advocacy Award for Fair Housing Advocacy, 2010
- Legal Aid Society of Cleveland, Appreciation for Annual Campaign and Work for Justice, 2009
- Nirmal Sinha Commissioners Award, awarded by the Ohio Civil Rights Commission, 2006
- United Way of Greater Cleveland "Spotlight Volunteer," 2006
- Rosa Parks Congressional Medal, Awarded by The Ohio Civil Rights Commission, 2005
- Certificate of Appreciation for 2004 Affirmative Direction Series, Bowling Green State University, 2004
- Fair Housing Achievement Award, issued by The Housing Advocates, Inc., 2003
- Resolution of the Cuyahoga County Commissioners saluting Diane E. Citrino Regional Director of the Ohio Civil Rights Commission, Akron, 2003
- Individual Achievement Award, Northern Ohio Fair Housing Alliance ("NOFHA"), 2003.
- Proclamation from Cuyahoga County Commissions recognizing Fair Housing Achievement, 2003
- Certificate of Appreciation, awarded by the Solon City Schools, for mentorship in law, 2001
- Year 2000 Ohio Civil Rights Commission Leadership Award by the Ohio Civil Rights Commission, for outstanding contributions furthering civil and human rights
- Selected as one of ten "Outstanding Women in the Law" by The Cleveland Bar Association, 1999
- Selected as one of ten "Lawyers of the Year" by Ohio Lawy...

**EXHIBIT
5**

# Think Practical Results.



**Diane E. Citrino**
dcitrino@thinkgk.com

## Community and Civic Service
- Chair, Ohio Advisory Committee to the U.S. Civil Rights Commission
- CMBA delegate, American Bar Association
- Member, House of Delegates of the American Bar Association (Decision Making Body)
- Solon YMCA Teen Court Advisory Board, 1997 to 2000
- FBI Hate Crimes Task Force, committee member, 1999 to 2011
- Merit Selection Committee member
- Cleveland Metropolitan Bar Association, Trustee, June 2006 to 2011



GIFFEN & KAMINSKI
Attorneys at Law

Suite 1600
1300 East Ninth Street
Cleveland, Ohio 44114
216.621.5161 ph
216.621.2399 fx

NAMWOLF

## Author & Selected Presentation Topics
- "Good Workplace Investigations Are Good Business," Cleveland Metropolitan Bar Journal, May 2017 (Co-Authored with Danielle Linert)
- Faculty, "Home, Sweet Home: Litigating Fair Housing Claims (based on Domestic Violence, Sexual Harassment, and Unequal Access)", North Carolina Bar Association Foundation, Cary, NC, June 27, 2014
- Moderator for Women of Color Foundation's The 21st Century Glass Ceiling: Women Breaking Through!" panel on employment discrimination, Cleveland, OH, November 7, 2013.
- Presenter, with OCRC Regional Director Darlene Newbern, "Overview of Fair Housing Laws and Emerging Issues" for Statewide Ohio Fair Housing Conference "Achieving the Full American Dream: Looking Back, Moving Forward and Building Bridges," Columbus, OH, June 10, 2013.
- Panelist with Yulanda McCarty-Harris, Valissa Turner Howard, and Sonali Bustamante Wilson (Moderator): *Re-Assessing the Equal Rights Amendment: Where are we now?* Women of Color Foundation, Cleveland, Ohio, April 2013
- Featured Speaker and Panelist for the FBA, Northern District of Ohio Chapter, 2012 Federal Labor & Employment Law Seminar, Cleveland, Ohio, May 22,2012
- Panelist for CLE credit with Alexandria Rudin, Esq., Jennifer Peyton, Esq., Amanda Ruiviejo-Pastor on the Violence Against Women Act speaking on "A Woman's Home Should be her Castle," Cleveland, OH, March 12, 2008.
- "Fair Housing, Disability and the Elderly," presented by Housing Research and Advocacy Center, with Susan Silverstein, Esq., Cleveland, OH, August 23, 2007.
- "Cause of Action for Handicapped Discrimination in Housing in Violation of the Federal Fair Housing Act [42 U.S.C.A. 3601 et seq.] and Related Federal Statutes," 22 Causes of Action 2d, West Publishing Co., June 2003. (co-author)
- "From Treasures to Trash: Understanding the Dynamics of Hoarding," Panel presentation for CLE credit with Judge Thomas A. Swift, Dr. Donald Malone, Judge Richard C. Pfeiffer, and others presented by the Ohio Coalition for Adult Protective Services, Cleveland, Ohio, September 19, 2002.
- "Best Practices in Litigation and Community Education," Predatory Lending in Ohio, Searching for Solutions, Sponsored by the Levin College of Urban Affairs, Cleveland-Marshall College of Law, Cuyahoga County Treasurer James Rokakis, and the Federal Reserve Bank of Cleveland, March 21, 2001, Cleveland, Ohio.
- "From Grey to Black: Crossing the line into Fraud in Mortgage Lending," The Mortgage Society, Independence, Ohio, November 16, 2000.
- "Sex, Lies, and Housing Discrimination," The 1999 Ohio Housing Conference, sponsored by Ohio Housing Finance Agency and Ohio Capital Corporation for Housing, Columbus, OH, November 23, 1999.
- "Lawyers making a Difference" Panel Discussion Member, 10th Judicial Conference of the Eighth Judicial District, with co-panelists Morris Dees, Esq., Hon. Nathaniel R. Jones, Hon. Ronald B. Adrine, Hon. Burt W. Griffin, Gerald S. Gold, Esq., Jose C. Feliciano, Esq., Jane Picker, Esq., Richard W. Pogue, Esq.; Westlake, Ohio, October 17, 1998.
- "What You Need to Know About Homeowners Insurance" (presented in Spanish), Third Hispanic Cleveland Unity Conference, Cleveland, Ohio, October 10, 1998.

# Think Practical Results.



**Diane E. Citrino**
dcitrino@thinkgk.com

Representative Cases

- *City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188 (2003). Co-counsel representing developer in fair housing dispute involving NIMBY ("Not In My Back Yard") opposition.
- *Gray et al. v. Brown et al.* Case No. 1:14 cv 225 (Northern District of Ohio) default judgment in excess of $4 million for three women against abusive landlords.
- *Miami Valley Fair Housing Center, Inc. v. The Connor Group*, 725 F. 3d 571 (2013). Unanimous 6th Circuit decision reversing jury verdict and ordering new trial for fair housing enforcement agency.
- *Eva v. Midwest National Mortgage Banc*, 143 F. Supp. 2d 862 (N.D. Ohio 2001). Lead counsel for plaintiffs in civil RICO case against predatory lenders and related entities. Judge Nugent of the Northern District of Ohio allowed claims to proceed in precedent-setting summary judgment ruling for plaintiffs.
- *Walker v. Crawford* (N.D. Ohio 1999). Lead counsel in civil trial representing multiple women and a fair housing agency against a landlord who sexually abused tenants over a period of years. Jury verdict for plaintiffs, including attorneys' fees in excess of half a million dollars.
- *Schorr v. Briarwood Estates Ltd. Partnership*, 178 F. R. D. 488 (N.D, Ohio 1998). Lead counsel in case representing disabled woman. This case reports a precedent-setting protective order issued by Judge Solomon Oliver.
- *Garnett v. Pearson*, 96 CV 1719 (N.D, Ohio 1996) FH-FL Rptr. U 16.181,1. Lead counsel for man and his child harassed by neighbor due to father being HIV positive. Bench trial before Chief Judge Matia in Northern District of Ohio resulting in injunctive relief and money for plaintiffs.
- *Byrd v. Brandeburg*, 922 F. Supp. 60 (N.D. Ohio 1996). Lead counsel for family fire-bombed by white, juvenile gang members. Case won by plaintiffs' motion for summary judgment.
- *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992). Second-chaired trial in Illinois for a class of 1,400 Spanish-speaking beauty school students defrauded of their Pell grant money and additional funds by fraudulent beauty school.



## GIFFEN & KAMINSKI
### Attorneys at Law

Suite 1600
1300 East Ninth Street
Cleveland, Ohio 44114
216.621.5161 ph
216.621.2399 fx

NAMWOLF

 

12/20/2018            Zukerman Daiker & Lear, Co. LPA Mail - Investigator

**GM i**

Brian A. Murray <bam@zukerman-law.com>

## Investigator
2 messages

Darnell Parker <dtp29@case.edu>           Tue, Dec 11, 2018 at 3:56 PM
To:
Cc: bam@zukerman-law.com

Dear

My name is Darnell Parker, Associate Vice President for Student Affairs and University Title IX Coordinator. I have copied your advisor of choice on this email. My office has been notified that an investigator has been reaching out to students on-campus regarding our investigation.

I ask that the investigator that is working on your behalf cease in contacting people on campus. This expands the number of people my office will have to talk to regarding the information we have in place. It also can be viewed as interfering with the university process. The parents of these individuals may also be concerned and will contact to us with their concerns. There is a No Contact Directive in place between you and the reporting party.

If you have any questions, please let me know.

Sincerely,
Darnell Parker

--

Darnell T. Parker
**Associate Vice President for Student Affairs**
**University Title IX Coordinator**

Phone: 216-368-2020
E-mail: darnell.parker@case.edu
Website: http://case.edu/title-ix/



Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and delete all copies of the original message

**EXHIBIT**
6